[Cite as *State v. Robinson*, 2017-Ohio-289.]

# Court of Appeals of Ohio

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

JOURNAL ENTRY AND OPINION
No. 104382

## STATE OF OHIO

PLAINTIFF-APPELLEE

vs.

## RICO ROBINSON

DEFENDANT-APPELLANT

## JUDGMENT:
AFFIRMED

Criminal Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CR-15-600684-A

**BEFORE:** Boyle, J., Jones, P.J., and Laster Mays, J.

**RELEASED AND JOURNALIZED:** January 26, 2017

**ATTORNEY FOR APPELLANT**

Mary Catherine O'Neill
50 Public Square, Suite 1900
Cleveland, Ohio   44113


**ATTORNEYS FOR APPELLEE**

Michael C. O'Malley
Cuyahoga County Prosecutor
BY:   Steven McIntosh
Assistant County Prosecutor
Justice Center, 9th Floor
1200 Ontario Street
Cleveland, Ohio   44113

MARY J. BOYLE, J.:

{¶1} Defendant-appellant, Rico Robinson, appeals his conviction of having a weapon while under disability. He raises two assignments of error for our review:

> 1. The guilty verdict cannot be upheld because the trial court erred in failing to grant the appellant's motion to suppress.

> 2. The guilty verdict cannot be upheld because evidence and testimony presented at trial did not establish appellant's guilt beyond a reasonable doubt.

{¶2} Finding no merit to Robinson's appeal, we affirm.

## I. Procedural History and Facts

{¶3} Robinson was indicted in November 2015 for events that occurred on the night of October 27, 2015. Robinson was charged with having a weapon while under disability in violation of R.C. 2923.13(A)(3), a third-degree felony, and carrying a concealed weapon in violation of R.C. 2923.12(A)(2), a fourth-degree felony. Both counts carried a forfeiture specification.

{¶4} Before trial, Robinson filed a motion to suppress. The following facts were presented at the hearing on his motion.

{¶5} Two Cleveland police detectives testified: detectives Thelemon Powell and Christopher Mobley. Both detectives work in the gang-impact unit, which covers all five districts in Cleveland. The gang-impact unit consists of four or five marked police cars that patrol together due to the high risk of danger associated with gangs.

{¶6} On October 27, 2015, the gang-impact unit was on routine patrol in the Fifth

District, traveling on East 105th Street, when they noticed a group of males in the street on Hampden Avenue. The detectives explained that they had a lot of experience in this area dealing with crime, including gangs, drugs, prostitution, and weapons. Specifically, the officers were familiar with a gang called the Hathaway Boys, also known as the Heartless Felons and the Hathaway Hustlers.

{¶7} Detective Powell testified that he and the other detectives turned onto Hampden Avenue with their lights and sirens activated (Powell said this; Mobley said just lights), and stopped in front of a house on Hampden Avenue. The officers intended to break up the group and tell the males to get out of the street.

{¶8} Detective Powell explained that he and his partner, Detective Gregory Williams, were in the second police car. Detective Powell said there were four men in the street and two or three on the curb. Detective Powell did not have his "gun drawn," but said that other officers had their guns out and pointed to the ground. The officers advised the men to get out of the street. The men complied and were cooperative. Detective Powell said that some of the detectives who were on the scene knew that the men were in the Hathaway Boys gang.

{¶9} Detective Powell testified that as they were walking up to the men in the street, Detective Williams noticed a man, who was later identified as Robinson, sitting on the front porch of the house where the officers had stopped their cars. Detective Powell said that he looked toward the porch, and although it was dark, he saw the man stand up quickly, make a furtive gesture with his arm, and place a "dark object" on a table beside

where he had been sitting.  Detective Powell thought that the object might be a gun based on his experience of seeing "someone [make] a furtive movement like that."

{¶10} According to Detective Powell, Detective Williams asked to talk to the man, but the man said "I don't have to talk to you."  The man then went in the house and locked the door.  Detective Williams walked directly up to the gate, which was open, and into the yard.  Detective Powell then stated, "and that is when [Detective Williams] said he had seen him with the gun."  By the time police figured out that the object was a gun, Robinson was already in the house.  Detective Powell said that they walked up to the porch and secured the gun.   The gun was a loaded semiautomatic Glock 17.

{¶11} Detective Mobley testified that he was in the third police vehicle that pulled up in front of the house on Hampden Avenue.  He and his partner parked their vehicle by an alley that was beside the house.  Detective Mobley said that his initial focus was on the man on the front porch, not the men in the street because he was too far back to see the men on the street.  Detective Mobley did not have his gun drawn.  He recognized the man as "Rico Biko" (Robinson's middle name).  He said that he saw Robinson stand up and turn to his right as if to block what he was doing from the police ("bladed himself from police").  Robinson then made a motion as if he was "setting something down or throwing something to his right."  Detective Mobley heard Detective Williams say something to Robinson, and then Robinson went inside the home.  Soon after that, one of the other detectives "yelled gun."

{¶12} When Robinson went in the house, some of the detectives ran around to the

back of the house to make sure that Robinson did not go out the back door. Detective Powell said the back door was locked from the inside, which led him to believe that the man could not have gone out the back door.

{¶13} Other detectives knocked on the door, but no one answered. A male and female showed up at the house. The male told the officers that no one should be in the house because only he and his mother lived there. The officers told him that a male just went into the home. The male and female let the officers in the house to look for Robinson.

{¶14} The trial court denied Robinson's motion and the case proceeded to trial.

{¶15} Robinson stipulated that he was the person who was convicted in the prior drug felony case that was listed in his indictment.

{¶16} In addition to detectives Powell and Mobley, Detective Williams also testified at trial. He said that on October 27, 2015, he was patrolling with other officers in the gang-impact unit. One of the officers in the front car recognized a group of men that were part of a gang standing in the street on Hampden Avenue. Detective Williams said that as he got out of his car, he noticed a man on the front porch of a house. Detective Williams advised Detective Powell that the man was there. Detective Williams stated that the man was sitting next to a table. When the man saw the police, he got up quickly and made a motion for the door. Detective Williams told the man, "[h]ey, come here." The man ignored him at first. Detective Williams said it again; the man replied, "Nope, I ain't gotta come." The man then went inside the house, closed the

door and locked it.

{¶17} After the man went inside, Detective Williams walked into the yard through an open gate and shined his flashlight on the porch. He immediately saw a gun on the table. Detective Williams told Detective Powell and the other officers that there was a gun on the porch.

{¶18} Detective Mobley, who had recognized Robinson on the front porch, said that he talked Robinson out of his grandmother's bedroom. Detective Williams said it was the same person who was on the front porch; he was dressed in all black and there was no one else in the home.

{¶19} Detective Powell was also present when Robinson came out of his grandmother's bedroom. Detective Powell said the man was the same person who had been sitting on the front porch.

{¶20} At the close of the state's case, Robinson moved for a Crim.R. 29 acquittal. The trial court granted it with respect to carrying a concealed weapon.

{¶21} Tracey Bumphers testified for Robinson. She said that she was at the house on Hampden Avenue right before police arrived; it was her great aunt's home. She said that Robinson was eating on the porch and did not have a gun.

{¶22} The jury found Robinson guilty of having a weapon while under disability. The trial court found Robinson guilty of the forfeiture specification. The trial court sentenced Robinson to one year of community control sanctions, advising Robinson that if he violated the terms of his community control sanctions, he would receive a sentence

of three years in prison.

## II.  Motion to Suppress

{¶23} In his first assignment of error, Robinson argues that the trial court erred when it denied his motion to suppress.  In his motion, Robinson argued his Fourth Amendment rights were violated when the police entered his yard and went onto his porch without a warrant; Robinson did not challenge what occurred after the police went into the home.

{¶24} This court reviews a decision on a suppression motion under a mixed standard of review.   "In a motion to suppress, the trial court assumes the role of trier of fact and is in the best position to resolve questions of fact and evaluate witness credibility."   *State v. Curry*, 95 Ohio App.3d 93, 96, 641 N.E.2d 1172 (8th Dist.1994).  Therefore, a reviewing court must accept the trial court's findings of fact in ruling on a motion to suppress if the findings are supported by competent, credible evidence.   *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71, ¶ 8.   Accepting the facts as true, the reviewing court then must independently determine, without deference to the trial court, whether the trial court properly applied the substantive law to the facts of the case.   *Id*.   An appellate court reviews the trial court's application of the law to its factual findings, however, based on a de novo standard of review.   *State v. Belton*, Slip Opinion No. 2016-Ohio-1581, ¶ 100.

{¶25} The Fourth Amendment to the United States Constitution guarantees "the right of the people to be secure in their persons, houses, papers, and effects, against

unreasonable searches and seizures." The Fourth Amendment is applicable to the states by way of the Fourteenth Amendment. *Mapp v. Ohio*, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961). Searches and seizures conducted outside of the judicial process, without a warrant based on probable cause, are per se unreasonable, unless they come within one of a few well-established exceptions. *Schneckloth v. Bustamonte*, 412 U.S. 218, 219, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). If evidence is obtained via actions that violate a person's Fourth Amendment rights, exclusion of the evidence is mandated. *Mapp*, *supra*.

{¶26} An officer may perform an investigatory stop without violating the Fourth Amendment as long as the officer is "able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Terry v. Ohio*, 392 U.S. 1, 21, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Reasonable suspicion has been described by courts as requiring more than an inchoate suspicion or a "hunch," but less than the heightened level of certainty required for probable cause. *State v. Shepherd*, 122 Ohio App.3d 358, 364, 701 N.E.2d 778 (2d Dist.1997).

{¶27} The trial court in this case found the officers' testimony credible regarding Robinson's furtive movement of quickly turning away from police and placing "an item, dark in color, down" on the table when he saw the police. When police attempted to talk to Robinson, he refused and walked quickly into the house. The trial court noted that police were patrolling an area that was "infested and crime ridden," and where "the use of

firearms [was] commonplace." The trial court found that based on the totality of the circumstances, the police had articulated reasonable suspicion that the man on the front porch may be armed and dangerous. We agree.

{¶28} The Ohio Supreme Court has held that "the propriety of an investigative stop by a police officer must be viewed in light of the totality of the circumstances." *State v. Freeman*, 64 Ohio St.2d 291, 414 N.E.2d 1044 (1980), paragraph one of the syllabus. In *Freeman*, the court held that the investigatory stop was justified when: (1) the suspect was in a high-crime area; (2) he was sitting alone in his car at the rear of the building for 20 minutes; (3) it was 3:00 a.m.; and (4) the police officer was aware of recent criminal activity in the area. *Id.* at 295.

{¶29} In *State v. Bobo*, 37 Ohio St.3d 177, 524 N.E.2d 489 (1988), the Ohio Supreme Court reiterated its totality-of-the-circumstances approach, holding that following facts were sufficient to justify an investigative stop: (1) there was heavy drug activity in the area; (2) it was nighttime; (3) the officer involved had 20 years of experience; (4) the officer had knowledge of how drug transactions were handled; (5) the suspect bent down as if to hide something under the seat of his car; (6) the officer's experience that the movement made by the suspect indicated that he was hiding a gun; and (7) the officers being out of their vehicle and exposed to gunfire if the suspect had in fact been armed. *Id.* at 179.

{¶30} A valid investigative stop must be based on more than a mere "hunch" that criminal activity is afoot. *United States v. Arvizu*, 534 U.S. 266, 274, 122 S.Ct. 744, 151

L.Ed.2d 740 (2002); *Terry*, 392 U.S. at 27, 88 S.Ct. 1868, 20 L.Ed.2d 889. Under the totality-of-the-circumstances approach, however, police officers are permitted to "draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.'" *Arvizu* at 273, quoting *United States v. Cortez*, 449 U.S. 411, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981). Thus, a court reviewing an officer's reasonable suspicion determination must give due weight to the officer's trained eye and experience and view the evidence through the eyes of law enforcement. *Id.*; *see also State v. Andrews*, 57 Ohio St.3d 86, 87-88, 565 N.E.2d 1271(1991).

{¶31} Although "[a] person's mere presence in an area of high-crime activity does not suspend the protections of the Fourth and Fourteenth Amendments to the United States Constitution," we have more than that in this case. *State v. Chandler*, 54 Ohio App.3d 92, 560 N.E.2d 832 (8th Dist.1989), paragraph two of the syllabus. In the present case, the area was known to the officers to be a high-crime area, with many weapons-related offenses, gang and drug activity, prostitution, and even a homicide occurring three doors down from Robinson's house. The incident occurred at night, around 9:30 p.m. Both officers who testified at the suppression hearing had many years of experience as police officers, including a number of those years in the Fifth District, where this incident took place. When Robinson saw the police, he made a quick, furtive gesture or movement with a dark object, as if to hide whatever he had from the officers' view. Detective Powell stated that based on his training and experience, he thought that

Robinson had a gun based on the furtive movement he made. Robinson then moved quickly into the house, ignoring Detective Williams's request to speak with him.

{¶32} Based on the totality of the circumstances in this case, we agree with the trial court that police had a reasonable articulated suspicion that criminal activity may be afoot to justify investigating further. Once they entered Robinson's yard, and walked toward the porch, they saw the gun in plain view sitting on a table.

{¶33} Robinson further argues that even assuming this court finds that the officers had reasonable articulable suspicion to further investigate, the evidence should be suppressed because the officers trespassed onto his property when they entered his yard through the gate and proceeded toward his front porch. In support of this argument, Robinson cites to *Florida v. Jardines*, 569 U.S. __, 133 S.Ct. 1409, 185 L.Ed.2d 495 (2013).

{¶34} After reviewing *Jardines*, we find Robinson's reliance on the case to be misplaced. Moreover, the reasoning set forth in *Jardines* supports an alternative reason for upholding the trial court's decision in this case.

{¶35} In *Jardines*, the issue presented was "whether using a drug-sniffing dog on a homeowner's porch to investigate the contents of the home [was] a 'search' within the meaning of the Fourth Amendment." *Id*. at 1413. The court held that it was, and affirmed the lower court's suppression of the evidence. *Id*. at 1417-1418. The court explained that "[t]he front porch is the classic exemplar of an area adjacent to the home and 'to which the activity of home life extends.'" *Id*. at 1412, 1415.

**{¶36}** The facts in *Jardines*, however, are distinguishable from the facts in this case. In *Jardines*, police had "received an unverified tip that marijuana was being grown" in Jardines's home. *Id*. at 1413. One month later, police, along with the Drug Enforcement Administration, sent a joint surveillance team to Jardines's home. They watched the "home for fifteen minutes and saw no vehicles in the driveway or activity around the home, and could not see inside because the blinds were drawn." *Id*. After watching the home for 15 minutes, they used a drug-sniffing dog to search Jardines's property for drugs. As the trained handler approached Jardines's front porch with the dog on a leash, the dog began to act erratically. The dog eventually stopped in front of Jardine's front door on his porch and sat down. Based on the dog's behavior, police obtained a warrant and subsequently found live marijuana plants inside Jardines's home.

**{¶37}** The United States Supreme Court reiterated in *Jardines* that "[a] police officer not armed with a warrant may approach a home in hopes of speaking to its occupants, because that is 'no more than any private citizen might do.'" *Id*. at 1416, quoting *Kentucky v. King*, 563 U.S.452, 131 S.Ct. 1849, 179 L.Ed.2d 865 (2011). The court distinguished that scenario, however, from the facts in *Jardines*, explaining:

> But introducing a trained police dog to explore the area around the home in hopes of discovering incriminating evidence is something else. There is no customary invitation to do that. An invitation to engage in canine forensic investigation assuredly does not inhere in the very act of hanging a knocker. To find a visitor knocking on the door is routine (even if sometimes unwelcome); to spot that same visitor exploring the front path with a metal detector, or marching his bloodhound into the garden before saying hello and asking permission, would inspire most of us to — well, call the police. The scope of a license — express or implied — is limited not only to a particular area but also to a specific purpose. Consent at a

traffic stop to an officer's checking out an anonymous tip that there is a body in the trunk does not permit the officer to rummage through the trunk for narcotics. Here, the background social norms that invite a visitor to the front door do not invite him there to conduct a search.

*Id.* at 1416.

**{¶38}** In *Jardines*, police intruded on Jardines's front porch and conducted a search without a warrant and without probable cause. That is simply not the case before us. A concurring justice's separate opinion in *Jardines* exemplifies this fact — that Robinson's case is distinguishable — even more:

> For me, a simple analogy clinches this case — and does so on privacy as well as property grounds. A stranger comes to the front door of your home carrying super-high-powered binoculars. * * * He doesn't knock or say hello. Instead, he stands on the porch and uses the binoculars to peer through your windows, into your home's furthest corners. It doesn't take long (the binoculars are really very fine): In just a couple of minutes, his uncommon behavior allows him to learn details of your life you disclose to no one. Has your "visitor" trespassed on your property, exceeding the license you have granted to members of the public to, say, drop off the mail or distribute campaign flyers? Yes, he has. And has he also invaded your "reasonable expectation of privacy," by nosing into intimacies you sensibly thought protected from disclosure? *Katz v. United States*, 389 U.S. 347, 360, 88 S.Ct.507, 19 L.Ed.2d 576 (1967) (Harlan, J., concurring). Yes, of course, he has done that too.

*Jardines*, 569 U.S. ___, 133 S.Ct.1409 at ¶ 18, 185 L.Ed.2d 495 (Kagan, J., concurring).

**{¶39}** In the present case, police saw Robinson make a furtive movement on his front porch from the street — a public thoroughfare — as soon as he noticed police get out of the vehicles. After making a furtive movement as if to hide something from police, Robinson went into his home quickly, refusing Detective Williams's requests to talk to him. Police approached Robinson's home, and as they neared the front porch,

they saw the gun in plain view.

**{¶40}** Notably, the United States Supreme Court reiterated in *Jardines* that "[a] police officer not armed with a warrant may approach a home in hopes of speaking to its occupants, because that is 'no more than any private citizen might do.'" *Id*. at 1416, quoting *King*, 563 U.S. 452, 131 S.Ct. 1849, 179 L.Ed.2d 865. Indeed, as the dissent pointed out (disagreeing that using the dog amounted to a search under the Fourth Amendment):

> [P]olice officers do not engage in a search when they approach the front door of a residence and seek to engage in what is termed a "knock and talk," i.e., knocking on the door and seeking to speak to an occupant for the purpose of gathering evidence. *See* [*Kentucky v. King*, 563 U.S. 452, 131 S.Ct.1849, 179 L.Ed.2d 865 (2011)] ("When law enforcement officers who are not armed with a warrant knock on a door, they do no more than any private citizen might do"). *See also* 1 LaFave § 2.3(e), at 592 ("It is not objectionable for an officer to come upon that part of the property which has been opened to public common use" (internal quotation marks omitted)). Even when the objective of a "knock and talk" is to obtain evidence that will lead to the homeowner's arrest and prosecution, the license to approach still applies. In other words, gathering evidence — even damning evidence — is a lawful activity that falls within the scope of the license to approach. And when officers walk up to the front door of a house, they are permitted to see, hear, and smell whatever can be detected from a lawful vantage point. *California v. Ciraolo*, 476 U.S. 207, 213, 106 S.Ct. 1809, 90 L.Ed.2d 210 (1986) ("The Fourth Amendment protection of the home has never been extended to require law enforcement officers to shield their eyes when passing by a home on public thoroughfares"); [*See State v. Cada*, 129 Idaho 224, 232, 923 P.2d 469, 478 (App.1996)] ("[P]olice officers restricting their activity to [areas to which the public is impliedly invited] are permitted the same intrusion and the same level of observation as would be expected from a reasonably respectful citizen" (internal quotation marks omitted)); 1 LaFave §§ 2.2(a), 2.3(c), at 450-452, 572-577.

**{¶41}** Thus, *Jardines* makes it clear that police could have entered Robinson's

yard to approach his front porch — even without reasonable suspicion of criminal activity. The fact that police entered the yard through a front gate of a fence, which surrounded the front yard, does not change the result. The gate was a common, chain-linked fence. To open the gate, one simply had to lift the lever. Police said the gate was open; Robinson argued that it was not. Whether the gate was open or not, however, does not change the analysis. Just as a stranger could come into Robinson's yard through the gate to approach his front door to sell him something, so could police. *See Jardines,* 569 U.S. __, 133 S.Ct. 1409, 185 L.Ed.2d 495.

{**¶42**} Accordingly, Robinson's first assignment of error is overruled.

## III.  Manifest Weight of the Evidence

{**¶43**} In his second assignment of error, Robinson argues that his conviction of having a weapon while under disability is against the manifest weight of the evidence.

{**¶44**} Unlike sufficiency of the evidence, a challenge to the manifest weight of the evidence attacks the credibility of the evidence presented. *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997). Because it is a broader review, a reviewing court may determine that a judgment of a trial court is sustained by sufficient evidence, but nevertheless conclude that the judgment is against the weight of the evidence. *Id.*, citing *State v. Robinson*, 162 Ohio St. 486, 487, 124 N.E.2d 148 (1955).

{**¶45**} In determining whether a conviction is against the manifest weight of the evidence, the court of appeals functions as a "thirteenth juror." *Id.* In doing so, it must review the entire record, weigh the evidence and all reasonable inferences, consider the

credibility of witnesses and determine "'whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983). Reversing a conviction as being against the manifest weight of the evidence and ordering a new trial should be reserved for only the "exceptional case in which the evidence weighs heavily against the conviction." *Id.*

{¶46} Robinson was convicted of having a weapon while under disability pursuant to R.C. 2923.13(A)(3), which provides:

> Unless relieved from disability under operation of law or legal process, no person shall knowingly acquire, have, carry, or use any firearm or dangerous ordnance, if any of the following apply:
> * * *
>
> The person is under indictment for or has been convicted of any felony offense involving the illegal possession, use, sale, administration, distribution, or trafficking in any drug of abuse or has been adjudicated a delinquent child for the commission of an offense that, if committed by an adult, would have been a felony offense involving the illegal possession, use, sale, administration, distribution, or trafficking in any drug of abuse.

{¶47} Robinson argues that his conviction is not supported by the weight of the evidence because police did not test the gun for fingerprints or DNA. He therefore maintains that they failed to prove that he "had or carried a firearm." Robinson acknowledges the fact that the state does not need physical evidence to prove a crime, but he argues that the officers' testimony — that they saw him with a gun — was not credible. He points to the fact that it was too dark for the officers to see him on the front

porch. He further argues that his witness provided reasonable doubt that he ever had a gun. We disagree.

{¶48} As Robinson acknowledges, fingerprints and DNA were not required to establish that he knowingly acquired, had, carried, or used a firearm. The officers' testimony was sufficient to establish that they saw Robinson set the gun down on the table before he went inside the home. The jury was aware of the time of night and knew that it was dark. The jury saw the photos that Robinson entered into evidence, showing how dark it was that night. The jury also heard Robinson's witness state that moments before police arrived, Robinson was sitting on the front porch without a gun. Nonetheless, the jury was free to believe the officers' testimony over Robinson's witness. The jury was also free to believe the officers when they testified that although it was dark, they could see a man make a furtive movement with a dark object in his hand, and that based on their years of experience, they believed that the object could be a gun.

{¶49} After review, this is not the "exceptional case in which the evidence weighs heavily against the conviction." After reviewing the entire record, weighing the evidence and all reasonable inferences, resolving conflicts in the evidence, and considering the credibility of witnesses, we conclude that the jury did not lose its way and create such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *Thompkins*, 78 Ohio St.3d at 678, N.E.2d 541.

{¶50} Accordingly, we overrule Robinson's second assignment of error.

{¶51} Judgment affirmed.

It is ordered that appellee recover from appellant the costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____

MARY J. BOYLE, JUDGE

ANITA LASTER MAYS, J., CONCURS;
LARRY A. JONES, SR., P.J., CONCURS IN JUDGMENT ONLY