[Cite as *State v. Belton*, 2024-Ohio-2357.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

STATE OF OHIO,                          :

    Plaintiff-Appellee,              :

    v.                               :

                                          No. 112813

CHAZ A. BELTON,                         :

    Defendant-Appellant.            :

---

## JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED IN PART, VACATED IN PART,
                AND REMANDED
**RELEASED AND JOURNALIZED:** June 20, 2024

---

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-22-670729-A

---

### *Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting
Attorney, and Owen Knapp, Assistant Prosecuting
Attorney, *for appellee.*

Joseph V. Pagano, *for appellant.*

MARY EILEEN KILBANE, P.J.:

{¶ 1} Defendant-appellant Chaz A. Belton ("Belton"), appeals his convictions. For the following reasons, we affirm in part, vacate in part, and remand.

**Factual and Procedural History**

{¶ 2} On June 16, 2022, in Cuyahoga C.P. No. CR-22-670729-A ("Case 670729"), a Cuyahoga County Grand Jury indicted Belton, along with a codefendant John Cobb, Jr. ("Cobb") on seven counts, alleging Belton and Cobb trafficked and possessed methamphetamines and criminal tools while seated in the front seat of Belton's vehicle.[1] Each count carried forfeiture specifications for a scale, money, automobile, and mobile telephone. The case proceeded to a jury trial.

{¶ 3} The testimony at trial revealed that on May 19, 2022, as part of an on-going investigation, Detective Cody Sheets and Detective Matthew Pollack ("Detective Pollack") of the Cleveland Division of Police conducted surveillance at East 118th and Craven Avenue, a high-crime neighborhood, for possible drug activity. The investigation included, but was not limited to, Cobb, a suspected drug dealer. The detectives observed a white SUV with tinted windows reverse into a driveway on East 118th Street and park halfway up the driveway; the driver remained in the vehicle. Detective Sheets, a five-year veteran on the police force who was trained in drug investigations, testified that drug dealers often park with the front of their car facing the street to allow them to see oncoming traffic and pedestrians and to flee quickly if needed. Detective Sheets also testified that drug dealers often drive vehicles with tinted windows. A search on the police department's LEADS computer indicated the white SUV was registered to Belton,

---

[1] Cobb filed a separate appeal in *State v. Cobb*, 2024-Ohio-458 (8th Dist.).

and the associated picture portrayed Belton with distinctive orange- and black-tipped braids. Based upon his hairstyle, Detective Sheets identified Belton as the driver of the SUV. Detective Pollack, a ten-year veteran on the police force with narcotics investigation training, testified that the LEADS search also gave the police reason to suspect Belton was involved with drug activity. The detectives did not know that Belton was parked in his own driveway.

{¶ 4} Around the same time that Detectives Sheets and Pollack noticed Belton, they observed Cobb drive down East 118th Street and park in a driveway across the street from where Belton was parked. Based upon Belton's suspicious behavior in backing into his driveway and not exiting his vehicle and the presence of Cobb in the area, Detective Sheets suspected drug activity might occur.

{¶ 5} Detectives Sheets and Pollack left the area because their vehicle was identifiable as a police vehicle. At Detective Sheets's request, Detective Daniel Hourihan ("Detective Hourihan") reported to the area in his unmarked vehicle, parked several houses away from Belton's home, and used binoculars to surveille Belton. At that time, none of the detectives knew Cobb was seated in the front passenger seat of Belton's vehicle. Presumably Cobb entered Belton's vehicle after Detectives Sheets and Pollack left the area and before Detective Hourihan began his surveillance.

{¶ 6} Detective Hourihan testified that he had a direct view of the passenger side of Belton's vehicle, and Belton remained in his car for approximately 45 minutes. During that time, Detective Hourihan observed two men, separately,

approach Belton's car, lean into the driver's side window for approximately one minute, and quickly walk away. One of the men performed these actions twice. Detective Hourihan testified that he also saw a woman from across the street go back and forth six or seven times and interact with Belton. Detective Hourihan was unsure of the purpose behind the female's interactions with Belton. Belton then moved his car from his driveway onto the street, parking directly in front of his house. A vehicle drove past and stopped alongside Belton's SUV. Belton exited his SUV, spoke briefly with the occupants of the other vehicle, and returned to his SUV.

{¶ 7} Based upon his 16 years as a police officer and training that included narcotics detection, Detective Hourihan concluded these interactions between Belton and the two men on foot and the vehicle on the street represented hand-to-hand drug transactions. Hand-to-hand drug transactions are typically depicted when a pedestrian approaches a vehicle; ducks his or her head inside the vehicle; interacts quickly with the vehicle's occupant; and walks away. Detective Hourihan premised his conclusions on how Belton initially parked his car in the driveway, with the front of the SUV facing the street, the high-crime neighborhood, and the quick encounters between Belton and the other individuals. Detective Hourihan did not observe the exchange of money or drugs, and he did not secure any photographs or video footage of the alleged transactions. Detective Hourihan also did not observe anyone enter or exit Belton's white SUV while it was under his surveillance.

{¶ 8} While watching Belton, Detective Hourihan relayed by radio his observations to Detective Sheets. Believing Belton was conducting drug

transactions from his vehicle, Detective Sheets directed a patrol car to park behind Belton's vehicle, with its lights activated, and conduct a traffic stop, claiming the officers were responding to a noise violation complaint; Detective Sheets intended to then approach from the front of Belton's vehicle. Detective Sheets asked the patrol car to provide the fictitious basis for the traffic stop because he thought Belton might flee the scene if he was told the officers were investigating potential drug-related activity.

{¶ 9} The patrol car acted as requested, and Detectives Sheets and Pollack approached from the front of Belton's SUV. Detective Pollack smelled a strong odor of marijuana. Detective Sheets testified that he saw Belton seated in the front driver's side of the SUV with his feet on the street; Belton then stood up, closed his car door, and walked towards the patrol officers. Detective Sheets further testified these actions were suspicious to him since drug dealers often separate themselves from the drugs in an attempt to avoid discovery of the narcotics.

{¶ 10} Detective Sheets unexpectedly observed Cobb seated in the front passenger seat of Belton's SUV. This was the first time Detective Sheets realized Cobb was in Belton's vehicle. Because Cobb had a knife on a chain around his neck, Detective Sheets asked Cobb to step out of the vehicle, conducted a pat down for weapons, and discovered a knife in Cobb's pocket and a bag of narcotics secured under the front waistband of Cobb's underwear. Cobb had a large bag that contained multiple smaller bags with prepackaged drugs; the bags contained an aggregate total of 15.14 grams of methamphetamine, which is typically sold as ecstasy. Detective

Sheets testified that drug dealers commonly store drugs in this manner to facilitate quick drug sales.  Cobb was also found in possession of a pill bottle with the name ripped off the label containing 60 mg capsules of Vyvanse (30-unit doses of lisdexamphetamine), a small bag containing 1.17 grams of cocaine hydrochloride, $27 cash, and a 110-gram weight, which is commonly used by drug traffickers to calibrate the scale.

{¶ 11} While Detective Sheets initially interacted with Cobb, Detective Pollack performed a pat down of Belton for weapons.  After narcotics were found on Cobb, Detective Sheets completed a search of Belton and found $9,882 in cash in his front pocket as well as a container with marijuana dipped in THC wax.  $9,460 was secured with a rubber band, and $422 was loose and folded in the same pocket.  Detective Sheets testified that drug dealers carry money in this manner; drug dealers carry a large amount of money secured with a rubber band and maintain a smaller amount of loose cash that they can easily access and use to provide change in hand-to-hand drug transactions.

{¶ 12} Upon finding the narcotics on Cobb and money on Belton, the detectives conducted a search of Belton's SUV and found a large bag of suspected marijuana, an orange pill bottle with the name ripped off the label containing 5 mg. tablets of oxycodone, and a digital scale with THC residue.  Detective Pollack testified that drug traffickers will typically have scales to weigh their product and ensure they are selling proper amounts.  Two mobile telephones were also seized,

which the detective testified are also common amount drug traffickers. The police arrested both Cobb and Belton.

{¶ 13} At the scene, Detective Sheets placed the seized drugs in police-designated drug bags. At the police district, the evidence was sealed, entered into evidence, and tagged. The evidence was sent to the medical examiner's office for testing, and Detective Sheets testified that the district's chain-of-custody protocol was followed.

{¶ 14} Detective Pollack stated it is common for people to work in tandem when selling drugs, with one person holding the money and one person holding the drugs. Therefore, if one of the individuals is apprehended, either the money or drugs are confiscated, but not both. Detective Pollack testified that based upon the amount of drugs found on Cobb's person, the presence of the scale, the large amount of cash possessed by Belton, and the suspected hand-to-hand drug transactions, the narcotics were intended to be used for drug trafficking rather than for personal consumption. Detective Sheets also testified the amount of drugs seized on May 19, 2022, was not consistent with personal consumption.

{¶ 15} On May 20, 2022, the evidence seized from Cobb and Belton was delivered to the Cuyahoga County Regional Forensic Science Laboratory ("lab") to test the items for the presence of controlled substances. Edgar Andrus ("Andrus"), a forensic scientist with the lab, testified that the evidence was received at the lab, properly entered into the lab's computer, assigned a case number, and tested by Andrus. Andrus further testified that upon the completion of his tests, he sorted the

evidence into individual bags, labeled the bags, and heat-sealed them to maintain the integrity of the products and the chain of custody. According to Andrus, daily calibrations are performed on the lab's equipment although Andrus did not complete the calibrations on the date he tested the evidence submitted on this case. Andrus also stated that the narcotics seized on May 19, 2022, contained a bulk amount of 15.14 grams of methamphetamines and the scale contained THC residue. On June 14, 2022, Andrus generated a report of his findings.

{¶ 16} On July 11, 2022, Belton pleaded not guilty to the indictment. The indictment charged Counts 1 and 3, trafficking in violation of R.C. 2925.03(A)(2); Counts 2, 4, 5, and 6, drug possession in violation of R.C. 2925.11(A); and Count 7, possessing criminal tools in violation of R.C. 2923.24(A). [2]

{¶ 17} Four months after Belton's May 19, 2022 arrest, on September 13, 2022, Belton was subject to a traffic stop, and the police discovered two suspected methamphetamine tablets, almost $2,000 in cash, and multiple mobile telephones. On December 5, 2022, in Cuyahoga C.P. No. CR-22-676587-A ("Case 676587"), a Cuyahoga County Grand Jury indicted Belton for one count of drug possession and one count of criminal tools, with forfeiture specifications on both counts.

{¶ 18} On February 13, 2023, the trial court conducted a hearing on Belton's motion to suppress the evidence seized at the time of Belton and Cobb's arrests and subsequently issued a detailed journal entry that denied Belton's motion.

---

[2] No charges were made related to the seized marijuana.

{¶ 19} On March 3, 2023, the State filed a motion for joinder seeking to join the two criminal cases pending against Belton. On March 13, 2023, Belton filed a brief in opposition, and the trial court summarily granted the motion for joinder on March 27, 2023, the day of trial. Prior to commencing trial, Belton pleaded guilty to the indictment in Case 676587; the trial court conducted a Crim.R. 11 plea colloquy and postponed sentencing until after the jury trial.

{¶ 20} On March 27, 2023, a jury trial commenced in Case 670729, with both Belton and Cobb as defendants. The State secured testimony from Detectives Hourihan, Sheets, and Pollack as well as Andrus, and defense counsel cross-examined the witnesses. After presenting its evidence, the State requested that the trial court provide complicity and constructive possession jury instructions, and the court granted the State's motion over Belton's objections. Defense counsel called Ashley Martin to testify on Belton's defense. At the close of evidence, the jury deliberated during which time the trial court issued a *Howard* charge.

{¶ 21} On March 31, 2023, the jury found Belton guilty on Count 1, trafficking of methamphetamines, Count 2, drug possession of methamphetamines, and Count 7, possessing criminal tools, but not guilty on all other counts. The jury also found Belton subject to forfeiture of the digital scale and cash.

{¶ 22} On May 1, 2023, the trial court sentenced Belton in both of his criminal cases — Case 670729 and Case 676587. In Case 670729, the court sentenced Belton to two years of imprisonment on Count 1 with a fine of $7,500; two years of imprisonment on Count 2 with a fine of $7,500; and six months of

imprisonment on Count 7 with all sentences running concurrently. In Case 676587, the court sentenced Belton to six months of imprisonment each on Count 1, drug possession, and Count 2, possessing criminal tools, with the sentences to run concurrently with the sentences imposed under Case 670729. Pursuant to the Reagan Tokes Law, the trial court sentenced Belton to an indefinite sentence of two to three years of imprisonment.

{¶ 23} On May 31, 2023, Belton filed a timely notice of appeal presenting seven assignments of error:

> Assignment of Error I: The trial court erred by denying Appellant's motion to suppress in violation of the Fourth and Fourteenth Amendment to the United States Constitution and Article I, Section 14 of the Ohio Constitution.

> Assignment of Error II: The trial court erred by denying counsel's motion to strike Juror 12 for cause and appellant was deprived of effective assistance of counsel in violation of the Sixth and Fourteenth Amendments to the United States Constitution and Article I, Section 10 to the Ohio Constitution when counsel did not exercise a peremptory challenge to remove Juror 12.

> Assignment of Error III: The trial court erred by granting the State's motion to join the indictments in one trial which resulted in prejudice to appellant.

> Assignment of Error IV: The trial court erred when it denied appellant's motion to exclude evidence and for acquittal under Crim.R. 29 because the State failed to present sufficient evidence to establish beyond a reasonable doubt the elements necessary to support the convictions.

> Assignment of Error V: Appellant's convictions are against the manifest weight of the evidence.

> Assignment of Error VI: Trial court erred by giving jury instructions on complicity and constructive possession over appellant's objection.

Assignment of Error VII: The trial court erred by failing to merge allied offenses of similar import over Appellant's objection and in violation of R.C. 2941.25(A) and his constitutional rights against double jeopardy.

**Legal Analysis**

**Motion to Suppress**

{¶ 24} In his first assignment of error, Belton argues that the trial court erred when it denied his motion to suppress. Specifically, Belton argues that the police lacked an articulable suspicion to stop and search him and, therefore, the stop and all items discovered in the search of his person and vehicle should have been excluded at trial.

{¶ 25} This court reviews a trial court's ruling on a motion to suppress under a mixed standard of review.

> "In a motion to suppress, the trial court assumes the role of trier of fact and is in the best position to resolve questions of fact and evaluate witness credibility." *State v. Curry*, 95 Ohio App.3d 93, 96, 641 N.E.2d 1172 (8th Dist.1994). The reviewing court must accept the trial court's findings of fact in ruling on a motion to suppress if the findings are supported by competent, credible evidence. *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71, ¶ 8. With respect to the trial court's conclusion of law, the reviewing court applies a de novo standard of review and decides whether the facts satisfy the applicable legal standard. *Id.*, citing *State v. McNamara*, 124 Ohio App.3d 706, 707 N.E.2d 539 (4th Dist.1997).

*State v. Miller*, 2018-Ohio-4898, ¶ 22 (8th Dist.).

{¶ 26} Here, the trial court found that the detectives had a strong suspicion that Belton was engaged in drug trafficking for the following reasons: (1) Cobb was a known suspected drug dealer; (2) the activities at issue occurred in a high-crime

area; (3) Detective Hourihan testified that based upon his training and experience he observed Belton engage in several suspected hand-to-hand drug transactions; and (4) Sergeant Sheets testified that he learned from running Belton's license plate through the police LEADS computer system that Belton had multiple drug offenses. *See* Feb. 17, 2023 judgment entry. Pursuant to these findings, the trial court determined the police officers searched Belton based upon a reasonable suspicion of criminal activity and subsequently conducted a valid search. The trial court denied Belton's motion to suppress.

{¶ 27} The Fourth and Fourteenth Amendments to the United States Constitution prohibit warrantless searches and seizures. Warrantless searches are per se unreasonable unless an exception applies. *Katz v. United States*, 389 U.S. 347, 357 (1967). Evidence obtained from an unreasonable search or seizure must be suppressed. *Mapp v. Ohio*, 367 U.S. 643, 651 (1961).

{¶ 28} One exception to a warrantless search is an investigative stop, also known as a *Terry* stop. *Terry v. Ohio*, 392 U.S. 1 (1968). An investigative stop is permissible if a police officer has a reasonable suspicion, based on specific and articulable facts, that an individual may be involved in criminal activity. *Id*. at 21-22. The propriety of an investigative stop must be viewed in light of the totality of the circumstances. *State v. Freeman*, 64 Ohio St.2d 291 (1980), paragraph one of the syllabus; *State v. Bobo*, 37 Ohio St.3d 177 (1988), paragraph one of the syllabus. "To justify an investigative stop, the officer must be able to articulate specific facts which would warrant a reasonably prudent police officer to believe that the person

stopped has committed or is committing a crime." *State v. Benton*, 2007-Ohio-1142, ¶ 13 (8th Dist.)

{¶ 29} Further, "'the "automobile exception" allows a police officer to conduct a warrantless search of portions of a motor vehicle provided he has probable cause to believe it contains evidence of a crime.'" *State v. Williams*, 2013-Ohio-594, ¶ 25 (4th Dist.), quoting *State v. Brooks*, 2012-Ohio-5235, ¶ 32 (3d Dist.), citing *Carroll v. United States*, 267 U.S. 132, 158-159 (1925); see *Pennsylvania v. Labron*, 518 U.S. 938, 940 (1996), citing *California v. Carney*, 471 U.S. 386, 393 (1985) ("If a car is readily mobile and probable cause exists to believe it contains contraband, the Fourth Amendment thus permits police to search the vehicle without more."). "Probable cause exists when there is a 'fair probability that contraband or evidence of a crime will be found in a particular place.'" *State v. Bostwick*, 2011-Ohio-3671 ¶ 25 (4th Dist.), quoting *State v. Evans*, 2006-Ohio-1425, ¶ 33 (2d Dist.), quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983).

{¶ 30} We must apply the facts accepted by the trial court to the applicable legal standard — whether the totality of the circumstances provided the police officers reasonable suspicion, based on specific articulable facts, that Belton may have been involved in criminal activity. In his motion to suppress, Belton assesses the accepted facts individually and contends no independent act taken by him demonstrated criminal conduct. Belton contends the officers saw him reverse his vehicle into his own driveway; remain in his own vehicle that was parked on his property; and interact with a few neighbors. Belton argues that the officers did not

observe the exchange of drugs or money. Belton also contends his prior drug history or his living in a high-crime neighborhood did not create reasonable suspicion to justify an investigative stop. However, Belton's arguments do not recognize that a court analyzes the totality of the circumstances when assessing a motion to suppress.

{¶ 31} Reviewing the facts collectively demonstrates that the police officers were policing Belton's neighborhood, a high-crime area, due to neighborhood complaints of drug trafficking. The detectives suspected Cobb of drug trafficking, and Cobb and Belton were together on the day in question. A LEADS search showed Belton had a prior criminal history for drug trafficking. Based upon his experience and training, Detective Hourihan concluded Belton engaged in multiple hand-to-hand drug transactions. The presented facts, taken together, support the trial court's conclusion that the police had a reasonable suspicion to initiate a *Terry* stop.

{¶ 32} The facts here are analogous to those presented in *State v. Victor*, 76 Ohio App.3d 372 (8th Dist.1991). In *Victor*, officers received numerous complaints about illegal drug sales at street corners in a specific area. While in that area, officers observed Victor wave his hands and motion occupants of passing vehicles to stop, and then lean into the passenger side window of a stopped vehicle. Officers testified these actions were typical for drug sales on the street. Victor also walked hurriedly away from the intersection once he noticed the approaching officers and placed an unknown object in his mouth. The *Victor* Court found the totality of the circumstances provided the officers reasonable suspicion that Victor possessed narcotics. Belton's attempts to differentiate the instant facts from *Victor* because

Belton parked his SUV in his own driveway, spoke to pedestrians in his own neighborhood, and did not flee when approached by the police are unpersuasive. An analysis of the whole picture, whether in *Victor* or the instant case, supports a finding that the officers had a reasonable suspicion to conduct a *Terry* stop.

{¶ 33} Based upon our conclusion that the investigative stop of Belton was proper, we next determine whether the detectives reasonably searched Belton's car. Police officers may conduct a warrantless search of a lawfully stopped automobile if they have probable cause to believe that the vehicle contains contraband. *State v. Jackson*, 2022-Ohio-187, ¶ 37 (8th Dist.), citing *United States v. Ross*, 456 U.S. 798, 799 (1982), citing *Carroll*, 267 U.S. 132 (1925); *see also State v. Young*, 2018-Ohio-3047, ¶ 13 (8th Dist.), citing *State v. Moore*, 90 Ohio St.3d 47, 52 (2000) ("Because marijuana and other narcotics are easily and quickly hidden or destroyed, a warrantless search may be justified to preserve evidence.").

{¶ 34} Pursuant to their search of Cobb and Belton, the investigating officers found narcotics, large sums of money, and a 100 gram weight that indicated to the officers that Cobb and Belton were trafficking narcotics. A warrantless search of Belton's vehicle was justified because the detectives had probable cause to believe Belton's SUV contained contraband.

{¶ 35} Accordingly, Belton's first assignment of error is without merit and is overruled.

**Motion to Strike Juror**

{¶ 36} In his second assignment of error, Belton argues that the trial court abused its discretion when it denied Belton's motion to strike Juror No. 12 for cause or, alternatively, his Sixth Amendment rights were violated when his counsel failed to use a peremptory challenge to remove Juror No. 12.

{¶ 37} As to the argument that the trial court abused its discretion, Belton contends "Juror 12's candid answers that he would find someone guilty by association were highly prejudicial in this case where the state was seeking to hold Belton accountable on a complicity theory." Appellant's brief, page 19. Defense counsel argued at trial that Juror No. 12 was biased and could not deliberate in a fair and impartial manner.

{¶ 38} A juror may be challenged for cause if his responses during voir dire indicate he "cannot be a fair and impartial juror or will not follow the law" as provided by the trial court. R.C. 2313.17(B)(9). A juror may also be removed for cause "if the court has any doubt as to the juror's being entirely unbiased." RC. 2313.17(D). Further, Crim.R. 24(C)(9) states a juror may be challenged for cause where

> [t]hat . . . juror is possessed of a state of mind evincing enmity or bias toward the defendant or the state; but no person summoned as a juror shall be disqualified by reason of a previously formed or expressed opinion with reference to the guilt or innocence of the accused, if the court is satisfied, from the examination of the juror or from other evidence, that the juror will render an impartial verdict according to the law and the evidence submitted to the jury at the trial.

{¶ 39} We review the trial court's decision on whether to remove a juror for cause for an abuse of discretion. *State v. Smith*, 80 Ohio St.3d 89, 105 (1997). The

term abuse of discretion "implies that the court's attitude is unreasonable, arbitrary or unconscionable." *Blakemore v. Blakemore*, 5 Ohio St.3d 217,219 (1983). An abuse of discretion occurs when a court exercises its judgment in an unwarranted way regarding a matter over which it has discretionary authority. *Johnson v. Abdullah*, 2021-Ohio-3304, ¶ 35.

{¶ 40} A judge has broad discretion in determining a juror's ability to be impartial. *State v. Nields*, 93 Ohio St.3d 6, 20 (2001). "Resolution of the impartiality issue rests in large part on the trial court's assessment of the juror's credibility and demeanor, and the context in which the issue arises." *State v. Blanton*, 2021-Ohio-65, ¶ 26 (8th Dist.), quoting *State v. White*, 2016-Ohio-3329, ¶ 34 (1st Dist.), citing *Skilling v. United States*, 561 U.S. 358, 386 (2010).

{¶ 41} Juror No. 12, a retired policeman from the Cleveland State University Police Department, was questioned throughout voir dire:

> DEFENSE COUNSEL: Who here believes in guilt by association? Be honest. I see you stewing, Officer.
>
> JUROR NO. 12: You're known by the company you keep. So I do believe that.
>
> DEFENSE COUNSEL: So let's talk a little bit about guilt by association. In a situation where you see two individuals who are being charged with crimes, okay, do you think that if you find out one of them absolutely has to be guilty, that the other one has to be guilty as well by association?
>
> JUROR NO. 12: Not necessarily, no.
>
> DEFENSE COUNSEL: Okay. What kind of factors are you going to look at, you know, when you make that determination?

JUROR NO. 12:  All the factors that are — that contribute to the crime.

DEFENSE COUNSEL:  Okay.  And you're going to get an instruction, I'm sure, from the judge on, you know, when somebody, you know, can be deemed an accomplice or when somebody, you know, might be — when you might be able to determine that somebody might have actually possessed something.

Do you think that you're going to be able to follow those directions that the judge gives you?

JUROR NO. 12:  Absolutely.

Tr. 274-275.

{¶ 42}  The following exchange occurred between defense counsel and Juror

No. 12 about grand jury indictments:

DEFENSE COUNSEL:  Juror No. 12, go ahead.

JUROR NO. 12:  In reference to being indicted, it's my understanding that they have — for those charges to go forward, they have to go in front of the grand jury so that it would have already been vetted, and if probable cause and reasonable suspicion and for this court to go forward it was there.

So it ain't just willy-nilly.  There's something there that eight people just like ourselves looked at and saw that it was legitimate to bring it to trial or court or to charge.  So, yes, I do have a presumption that something's up, but I'm not going to be presumptuous that they're guilty, but I'm going to lean in that direction.

DEFENSE COUNSEL:   Yeah, that's fair because regular people everyday just don't get indicted, right?  There had to be something that caused them to come to the — at least on the radar of law enforcement, right?  Right?

Fair enough?  Is that a fair statement?  You believe what I just said?

JUROR NO. 12:  Yeah.

DEFENSE COUNSEL: Okay. But it also doesn't mean that they're necessarily guilty, right?

JUROR NO. 12: That it's enough to bring them before — that it's enough to proceed with charges. That's all it is.

Tr. 293-294.

{¶ 43} Further, Juror No. 12 stated his role was to presume both defendants were innocent:

DEFENSE COUNSEL: Okay. And the bigger question, the more important question for you is are you able to divorce that suspicion from your mind as it relates to this particular matter and look upon both these individuals as though they're probably innocent right now?

JUROR NO. 12: My role here is to presume that they're innocent.

Tr. 295-296. Juror No. 12 also stated that if the evidence showed one defendant was guilty beyond a reasonable doubt but there was not a similar showing of evidence against the codefendant, he could not "send them both down the river." Tr. 297.

{¶ 44} Juror No. 12 stated a grand jury must first find probable cause and reasonable suspicion before indicting an individual but an indictment does not equate to a presumption of guilt. Juror No. 12 also stated he presumed both defendants were innocent and each defendant's guilt had to be assessed pursuant to the trial court's instructions. Because Juror No. 12 stated he would presume the defendants were innocent, the trial court denied defense counsel's motion to remove the juror for cause. We do not find Juror No. 12's comments demonstrated bias or partiality and, therefore, the trial court's denial of Belton's challenge to the juror for cause was not an abuse of discretion.

{¶ 45} Belton also asserts that his Sixth Amendment rights were violated when his trial attorney failed to remove Juror No. 12 with a peremptory challenge. Specifically, Belton argues that Juror No. 12's bias against the defendant — as demonstrated by the juror's statement that "you're known for the company you keep" — likely influenced Juror No. 12's opinion and the rest of the jury panel resulting in Belton's convictions on Counts 1, 2, and 7.

{¶ 46} Ohio Const., art. I, § 10 and U.S. Const., amend. VI provide that defendants in all criminal proceedings shall have the assistance of counsel for their defense. The United States Supreme Court has recognized that "the right to counsel is the right to effective assistance of counsel." *Strickland v. Washington*, 466 U.S. 668 (1984).

{¶ 47} To establish ineffective assistance of counsel, Belton must demonstrate that (1) counsel's performance was deficient; and (2) the deficient performance prejudiced him so as to deprive him of a fair trial. *State v. Trimble*, 122 Ohio St.3d 297, ¶ 98 (2009), citing *Strickland* at 687. The failure to prove either prong of this two-part test makes it unnecessary for a court to consider the other prong. *State v. Madrigal*, 87 Ohio St.3d 378, 389 (2000), citing *Strickland* at 697.

{¶ 48} Belton failed to establish prejudice. "When a defendant bases an ineffective-assistance claim on an assertion that his counsel allowed the impanelment of a biased juror, the defendant 'must show that the juror was actually biased against him.'" *State v. Mundt*, 2007-Ohio-4836, ¶ 67, quoting *Miller v. Francis*, 269 F.3d 609, 616 (6th Cir.2001), citing *Hughes v. United States*, 258 F.3d

453, 458 (6th Cir. 2001). The transcript does not demonstrate Juror No. 12 was biased against Belton; conversely, Juror No. 12's responses indicated his ability to act as a fair and impartial factfinder.

{¶ 49} Belton's second assignment of error is without merit and is overruled.

**Joinder of Indictments**

{¶ 50} In his third assignment of error, Belton contends he was prejudiced when the trial court granted the state's motion to join the two indictments against Belton.

{¶ 51} Belton was indicted in two separate criminal actions — Case 670729 and Case 676587. Case 670729 stemmed from the incident on May 19, 2022, when Belton was charged with drug trafficking, drug possession, and possession of criminal tools for allegedly conducting hand-to-hand drug transactions from his parked vehicle. Case 676587 occurred four months later, at a different location, when Belton was pulled over in a traffic stop, and the police allegedly found Belton in possession of two methamphetamine pills, almost $2,000 cash, and multiple mobile telephones.

{¶ 52} On March 3, 2023, the state filed a motion for joinder pursuant to Crim.R. 8(A), claiming the offenses in both cases were of the same or similar character and part of a course of criminal conduct. On March 13, 2023, Belton filed a brief in opposition arguing the offenses were not of the same or similar character and he would be prejudiced by joinder. On March 27, 2023, the trial court granted the state's motion for joinder.

{¶ 53} On March 31, 2023, the morning of trial, defense counsel stated that "in consideration of, you know, the implications of a joinder, Mr. Belton does wish to knowingly voluntarily waive his rights to trial on Case 676587 and go ahead and plead to the indictment as indicated by the State, Your Honor." Tr. 82. The trial court conducted a Crim.R. 11 colloquy, and Belton pleaded guilty to Count 1, drug possession, Count 2, criminal tools, and the forfeiture specifications on both counts. At trial the only charges presented against Belton were those stemming from Case 670729.

{¶ 54} Belton now contends on appeal that the trial court's decision to grant the state's motion for joinder prejudiced him. Specifically, Belton claims the ruling forced him to enter a guilty plea in Case 676587 to avoid introduction of the charges and evidence in that case that he felt would prejudice him.

{¶ 55} This court has found that

> [w]hen a defendant enters a guilty plea, he generally waives all appealable errors that may have occurred unless such errors are shown to have precluded the defendant from entering a knowing and voluntary plea. *State v. Jabbaar*, 8th Dist. Cuyahoga No. 98212, 2013-Ohio-2897, ¶ 5; *State v. Milczewski*, 8th Dist. Cuyahoga No. 97138, 2012-Ohio-1743, ¶ 5; *State v. Kelley*, 57 Ohio St. 3d 127, 566 N.E.2d 658 (1991), paragraph two of the syllabus. This waiver includes the right to challenge the denial of a Crim.R. 14 motion to sever or motion for relief from joinder. *See, e.g., State v. Wolfe*, 6th Dist. Wood No. WD-14-022, 2015-Ohio-564, ¶ 15.

*State v. Wilson*, 2018-Ohio-3666, ¶ 6 (8th Dist.). Thus, upon entering his guilty plea, Belton waived his right to challenge the trial court's ruling on the state's motion for joinder.

{¶ 56} Accordingly, Belton's third assignment of error is without merit and is overruled.

**Admission of Evidence and Motion for Acquittal**

{¶ 57} In the fourth assignment of error, Belton argues that the trial court erred when it denied his motion for acquittal under Crim.R. 29 because the state failed to present sufficient evidence to establish beyond a reasonable doubt the elements necessary to support the convictions. Specifically, Belton asserts that the state failed to establish a chain of custody for the evidence obtained during the search and seizure of Belton and his vehicle. Belton further contends there was insufficient evidence to show he used the money in his pocket to engage in drug trafficking or drug possession; to establish the digital scale was used by Belton to weigh methamphetamines; and to show he aided and abetted Cobb who possessed the narcotics.

{¶ 58} Crim.R. 29(A) provides that a court "shall order the entry of the judgment of acquittal of one or more offenses . . . if the evidence is insufficient to sustain a conviction of such offense or offenses." "Because a Crim.R. 29 motion questions the sufficiency of the evidence, '[w]e apply the same standard of review to Crim.R. 29 motions as we use in reviewing the sufficiency of the evidence.'" *Fairview Park v. Peah*, 2021-Ohio-2685, ¶ 37 (8th Dist.), quoting *State v. Tenace*, 2006-Ohio-2417, ¶ 37.

{¶ 59} A sufficiency-of-the-evidence challenge requires a determination of whether the state has met its burden of production at trial. *State v. Hunter*, 2006-

Ohio-20, ¶ 41 (8th Dist.), citing *State v. Thompkins*, 78 Ohio St.3d 380, 390 (1997). An appellate court reviewing sufficiency of the evidence must determine "'whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.'" *State v. Leonard*, 2004-Ohio-6235, ¶ 77, quoting *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus. With a sufficiency inquiry, an appellate court does not review whether the state's evidence is to be believed but whether, if believed, the evidence admitted at trial supported the conviction. *State v. Starks*, 2009-Ohio-3375, ¶ 25 (8th Dist.), citing *Thompkins* at 387. A sufficiency of the evidence argument is not a factual determination, but a question of law. *Id.*

{¶ 60} In a sufficiency inquiry, we also assume the state's witnesses testified truthfully and evaluate whether that testimony, along with any other evidence introduced at trial, satisfies each element of the offense. *In re D.R.S.*, 2016-Ohio-3262, ¶ 23 (8th Dist.). The elements of an offense may be proven by direct evidence, circumstantial evidence, or both. *See, e.g., State v. Wells*, 2021-Ohio-2585, ¶ 25 (8th Dist.), citing *State v. Durr*, 58 Ohio St.3d 86 (1991). "Direct evidence exists when 'a witness testifies about a matter within the witness's personal knowledge such that the trier of fact is not required to draw an inference from the evidence to the proposition that it is offered to establish.'" *Wells* at ¶ 25, quoting *State v. Cassano*, 2012-Ohio-4047, ¶ 13 (8th Dist.). Circumstantial evidence is "evidence that requires 'the drawing of inferences that are reasonably permitted by the evidence.'" *Wells* at ¶ 25, quoting *Cassano* at ¶ 13; *see also State v. Hartman*, 2008-Ohio-3683, ¶ 37

(8th Dist.) ("[C]ircumstantial evidence is the proof of facts by direct evidence from which the trier of fact may infer or derive by reasoning other facts in accordance with the common experience of mankind."). Circumstantial evidence and direct evidence have "equal evidentiary value." *Wells* at ¶ 26, citing *State v. Santiago*, 2011-Ohio-1691, ¶ 12 (8th Dist.).

{¶ 61} Relevant to our review of the trial court's Crim.R. 29 ruling are the offenses upon which the jury found Belton guilty: trafficking, drug possession, and possession of criminal tools. The jury found Belton guilty of Count 1, trafficking, in violation of R.C. 2925.03(A)(2) that reads:

(A) No person shall knowingly do any of the following:

. . .

(2) Prepare for shipment, ship, transport, deliver, prepare for distribution, or distribute a controlled substance or a controlled substance analog, when the offender knows or has reasonable cause to believe that the controlled substance or a controlled substance analog is intended for sale or resale by the offender or another person.

Belton was convicted on Count 2, drug possession, in violation of R.C. 2925.11(A): "No person shall knowingly obtain, possess, or use a controlled substance or a controlled substance analog." The jury found Belton guilty of trafficking and drug possession of methamphetamines in an amount that exceeded five times the bulk amount but less than 50 times the bulk amount. In relation to Counts 1 and 2, the jury found the digital scale and $9,882 in cash were subject to forfeiture.

{¶ 62} The jury also found Belton guilty of Count 7, possessing criminal tools, in violation of R.C. 2923.24(A): "No person shall possess or have under the

person's control any substance, device, instrument, or article, with purpose to use it criminally."

{¶ 63} The evidence showed that the detectives were present in Belton's neighborhood — a high-crime area — in response to citizen complaints about drug activity and drug sales. Detectives Hourihan, Sheets, and Pollack all described behaviors often demonstrated by drug dealers such as backing one's vehicle into his driveway to allow easy viewing of incoming customers and law enforcement; conducting hand-to-hand drug transactions; carrying a large amount of money bundled together along with loose cash to provide change during drug sales; using a digital scale to facilitate the weighing and sale of narcotics; and two drug dealers working in tandem with one person handling the drugs and a second person holding the money. Further, the detectives testified that Belton exhibited these behaviors on May 19, 2022. Andrus testified to the positive lab results and the weight of the seized drugs.

{¶ 64} While the methamphetamines were not found in Belton's actual possession, the jury could have concluded that he had constructive possession of the drugs. Constructive possession does not require immediate physical possession; it is established by proof that a person knowingly exercises dominion and control over the item. *State v. Natale*, 2011-Ohio-3974, ¶ 12 (8th Dist.); *see also State v. Slade*, 145 Ohio App.3d 241, 243 (8th Dist.2001) ("[R]eadily usable drugs in close proximity to an accused may constitute sufficient circumstantial evidence to support a finding of constructive possession."). Detective Hourihan testified that he

observed what he considered hand-to-hand drug transactions between alleged drug buyers and Belton seated in the front driver's seat of the car. During those transactions, Cobb was seated in the front passenger seat and the drugs ultimately recovered from Cobb's underwear were in Belton's vehicle when the alleged drug transactions occurred.

{¶ 65} There was also sufficient evidence to establish complicity. At trial, the State argued that Belton aided and abetted Cobb in the commission of the drug offenses. "When an individual acts to aid or abet a principal in the commission of an offense, the individual and principal are equally guilty and the individual is prosecuted and punished as if he were a principal offender. R.C. 2923.03(F)." *State v. Shary*, 2021-Ohio-3604, ¶ 40 (8th Dist.).

{¶ 66} To prove complicity by aiding and abetting under R.C. 2923.03(A)(2), the evidence must demonstrate that Belton "supported, assisted, encouraged, cooperated with, advised, or incited [Cobb] in the commission of the crime, and that [Belton] shared the criminal intent of [Cobb]." *State v. Johnson*, 93 Ohio St.3d 240 (2001), syllabus. "Such intent may be inferred from the circumstances surrounding the crime." *Id.* at 246. "'[P]articipation in criminal intent may be inferred from presence, companionship and conduct before and after the offense is committed.'" *Id.* at 245, quoting *State v. Pruett*, 28 Ohio App.2d 29, 34 (4th Dist.1971). "A common purpose among persons to commit a crime need not be shown by positive evidence but may be inferred from circumstances surrounding the act and from the

defendant's subsequent conduct." *Shary* at ¶ 41, citing *State v. Gonzalez*, 2011-Ohio-1193, ¶ 25 (10th Dist.), citing *Pruett*.

{¶ 67} Here, Belton and Cobb were both present in the vehicle from which the alleged hand-to-hand drug transactions took place. The alleged drug buyers went to the driver's side of the vehicle where Belton was seated to conduct business. The detectives found over $9,000 in Belton's pocket; methamphetamines in Cobb's possession; and a digital scale in Belton's vehicle. This evidence, along with the testimony of Detectives Hourihan, Sheets, and Pollack as to the general behavior of drug dealers and their conclusions that the amount of confiscated methamphetamines were not consistent with individual consumption but drug trafficking, were sufficient to find that Belton aided and abetted Cobb in trafficking and drug possession.

{¶ 68} Belton claims a breach in the chain of custody occurred and the State could not establish the alleged drugs confiscated on May 19, 2022, were narcotics. The State was not required to establish a perfect, unbroken chain of custody, but evidence to show it was ""reasonably certain that substitution, alteration or tampering did not occur."" *State v. Cobb*, 2024-Ohio-458, ¶ 14 (8th Dist.), quoting *State v. Sims*, 2007-Ohio-6821, ¶ 14 (8th Dist.), quoting *State v. Blevins*, 36 Ohio App.3d 147, 150 (10th Dist.1987).

{¶ 69} Detective Sheets testified to the protocol followed on May 19, 2022, when collecting the drugs, money, and other evidence that included bagging, tagging, storing, and delivering the evidence to the lab. Similarly, Andrus testified

to the lab's protocols which were followed.  The witnesses' inability to identify the specific individual who delivered the samples from the police department to the lab or the individual lab technician who calibrated the lab's equipment on the date of testing did not breach the chain of custody.

{¶ 70} Viewing the evidence in a light most favorable to the State, there was more than sufficient evidence for the jury to have concluded that Belton was guilty of trafficking, drug possession, and possession of criminal tools.

{¶ 71} For these reasons, Belton's fourth assignment of error is without merit and overruled.

**Manifest Weight of the Evidence**

{¶ 72} In his fifth assignment of error, Belton contends the jury's verdict was against the manifest weight of the evidence.  A manifest weight challenge questions the credibility of the evidence presented and examines whether the State met its burden of persuasion at trial.  *State v. Whitsett*, 2014-Ohio-4933, ¶ 26 (8th Dist.), citing *Thompkins*, 78 Ohio St.3d 380 at 387; *State v. Bowden*, 2009-Ohio-3598, ¶ 13 (8th Dist.), citing *Thompkins* at 390.  A reviewing court "weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered."  *State v. Martin*, 20 Ohio App.3d 172, 485 (1st Dist.1983), paragraph three of the syllabus.  When considering an appellant's claim that a conviction is against the manifest weight of the evidence, the court of appeals sits as

a "thirteenth juror" and may disagree with the factfinder's resolution of the conflicting testimony. *Thompkins* at 387, citing *Tibbs v. Florida*, 457 U.S. 31, 42 (1982). A reversal on the basis that a verdict is against the manifest weight of the evidence is granted "only in the exceptional case in which the evidence weighs heavily against the conviction." *Martin*.

{¶ 73} Belton does not challenge the weight afforded to any specific testimony or evidence, but reiterates the same reasoning offered in his sufficiency of the evidence argument. As discussed above, the State presented ample evidence showing Belton and Cobb acted together in the trafficking and possession of methamphetamines and criminal tools. Detectives Hourihan, Sheets, and Pollack testified as to their investigation and the evidence they obtained on May 19, 2022. Defense counsel thoroughly cross-examined the detectives. The detectives testified that their conclusions were based upon their experience and training. While defense counsel argued at trial that he did not find the detectives' claims that they received training on narcotics investigations credible, we find that the detectives' inability to identify by name the books they read in training, the titles of the courses, or the names of their instructors did not discredit their testimony.

{¶ 74} The jury was presented with all relevant information and was free to infer from the evidence that Belton knowingly engaged in drug trafficking and possessed methamphetamines and criminal tools. After reviewing the record in this case, we cannot say this is an "exceptional case" where the trial court clearly lost its

way and created such a manifest miscarriage of justice that Belton's convictions were against the manifest weight of the evidence. *Thompkins* at 387.

{¶ 75} For the foregoing reasons, we find that Belton's convictions were not against the manifest weight of the evidence, and Belton's fifth assignment of error is without merit and is overruled.

**Jury Instructions**

{¶ 76} In the sixth assignment of error, Belton argues that the trial court erred when it provided jury instructions, over his objections, on complicity and constructive possession. Specifically, Belton argues insufficient evidence was presented to demonstrate complicity or constructive possession and, therefore, the trial court abused its discretion when it provided these instructions.

{¶ 77} A trial court's decision to provide a specific jury instruction is within the sound discretion of the court, and such a decision will be reviewed under an abuse of discretion standard. *Robinson v. Turoczy Bonding Co.*, 2016-Ohio-7397, ¶ 28 (8th Dist.), citing *Sicklesmith v. Hoist*, 2006-Ohio-6137, ¶ 62 (7th Dist.). Further, "[r]equested jury instructions should ordinarily be given if they are correct statements of law, if they are applicable to the facts in the case, and if reasonable minds might reach the conclusion sought by the requested instruction." *State v. Adams*, 2015-Ohio-3954, ¶ 240, citing *Murphy v. Carrollton Mfg. Co.*, 61 Ohio St.3d 585, 591 (1991).

{¶ 78} We previously discussed both complicity and constructive possession in regards to Belton's fourth assignment of error. We found that the State

introduced sufficient evidence to demonstrate Belton aided and abetted Cobb in trafficking and drug possession of methamphetamines. Additionally, we found that the State presented sufficient evidence to show Belton was in constructive possession of the methamphetamines. As such, the trial court properly provided jury instructions on complicity and constructive possession.

{¶ 79} Belton's sixth assignment of error is without merit and is overruled.

**Merger of Allied Offenses of Similar Import**

{¶ 80} In his seventh assignment of error, Belton argues that Count 1, drug trafficking, and Count 2, drug possession, for the same controlled substance — methamphetamines — are allied offenses of similar import and, therefore, the trial court erred when it failed to merge the convictions. The State concedes this assigned error.

{¶ 81} "'Ohio courts have long recognized that, in most instances, trafficking and possession charges based on the same contraband are allied offenses requiring merger.'" *Cobb*, 2024-Ohio-458, ¶ 28 (8th Dist.), quoting *State v. Mitchell*, 2022-Ohio-4355, ¶ 24 (1st Dist.), citing *State v. Murph*, 2015-Ohio-5076, ¶ 7 (1st Dist.); *State v. Fenderson*, 2022-Ohio-1973, ¶ 86 (6th Dist.). The nature of a drug-trafficking offense under R.C. 2925.03(A)(2), which requires the offender to knowingly "prepare for shipment, ship, transport, deliver, prepare for distribution, or distribute a controlled substance" necessarily includes, to some degree, possession of the drugs. *Cobb*, quoting *State v. Martin*, 2024-Ohio-10, ¶ 34 (1st Dist.), quoting *Murph* at ¶ 7.

{¶ 82} Upon the record before us, we agree that Counts 1 and 2 are allied offenses pursuant to R.C. 2941.25(A), and the counts should have merged for sentencing. Therefore, the trial court committed plain error when it sentenced Belton on both counts. *State v. Soto*, 2011-Ohio-785, ¶ 38 (8th Dist.); *see also Prude* at ¶ 25-27.

{¶ 83} Accordingly, we sustain Belton's seventh assignment of error. Belton's sentences for Counts 1 and 2 are vacated, and the case is remanded with instructions for the trial court to merge Counts 1 and 2, the offenses of trafficking and drug possession of methamphetamines. The trial court shall allow the State to elect which of the allied offenses to pursue for sentencing, and the trial court shall resentence Belton on the count elected by the State. The jury's findings of guilt for committing the allied offenses remain intact, both before and after sentencing for the allied offenses. *See State v. Kirk*, 2011-Ohio-1687, ¶ 52 (8th Dist.).

{¶ 84} Judgment affirmed in part, sentence vacated in part, and case remanded for merger and resentencing.

It is ordered that appellant and appellee share costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
MARY EILEEN KILBANE, PRESIDING JUDGE

LISA B. FORBES, J., CONCURS;
ANITA LASTER MAYS, J., DISSENTS (WITH SEPARATE OPINION)


ANITA LASTER MAYS, J., DISSENTING:

{¶ 85} I respectfully disagree with the majority's determination that under the totality of the circumstances the officers had reasonable suspicion that Belton was engaged in criminal activities and that the trial court did not err when it denied Belton's motion to suppress. I therefore dissent and write separately.

{¶ 86} The majority states that the trial court found that the detectives had a strong suspicion that Belton was engaged in drug trafficking for the following reasons: (1) Cobbs was a known suspected drug dealer; (2) the activities at issue occurred in a high-crime area; (3) Detective Hourihan testified that based upon his training and experience he observed Belton engage in several suspected hand-to-hand drug transactions; and (4) Detective Sheets testified that he learned from running Belton's license plate through the police LEADS computer system that Belton had multiple drug offenses. *See* Feb. 17, 2023 judgment entry. Pursuant to these findings, the trial court determined the police officers searched Belton based

upon a reasonable suspicion of criminal activity and subsequently conducted a valid search.

{¶ 87} A review of the record established that Detective Sheets was in the area because of citizen complaints. Detective Sheets stated that East 118th and Craven is a high-crime area. Detective Sheets saw a white SUV and immediately ran its license plates in LEADS. There was no evidence that the driver had broken any laws. He discovered that the driver was Belton. He then ran Belton's information through the police system. He learned that Belton lived at the address where he backed into the yard. Thus, Belton lived in a high-crime area. Living in a high-crime area is not against the law. The Supreme Court has held that merely being in a high-crime area is insufficient to justify an investigatory stop. "To hold otherwise would result in the wholesale loss of the personal liberty of those with the misfortune of living in high crime areas." (Citation omitted.) *State v. Carter*, 69 Ohio St.3d 57, 65 (1994). *State v. Ward*, 2017-Ohio-8141, ¶ 19 (1st Dist.). Additionally, "[a] person's mere presence in an area of high-crime activity does not suspend the protections of the Fourth and Fourteenth Amendments to the United States Constitution," *State v. Robinson*, 2017-Ohio-289, ¶ 31 (8th Dist.).

{¶ 88} As was mentioned above, Belton backed into his own driveway. Detective Sheets stated that was suspicious. However, "'acts that are essentially neutral or ambiguous do not become specifically criminal in character because they occur in a high crime area.'" *State v. Ferrante*, 2011-Ohio-4870, ¶ 26 (2d Dist.), quoting *State v. Maldonado*, 1993 WL 402772 (2d Dist. Sept. 24, 1993), quoting

*Ward* at ¶ 19. Cobbs then appeared and parked in a driveway across the street from Belton.

{¶ 89} Detective Sheets testified that he had never encountered Belton before. His focus was on Cobb. He also testified that after running Belton's name through the police system, he learned that Belton had a criminal record consisting of drug offenses. It is important to note that a person's past criminal history, standing alone, does not provide the required level of suspicion to justify expanding the scope of the initial intrusion from a traffic stop into a criminal investigation. *See Katz, Ohio Arrest, Search and Seizure,* Section 18:11 (2016 Ed.), citing *State v. Whitman*, 2009-Ohio-5647 (5th Dist.), quoting *United States. v. Sandoval*, 29 F.3d 537, 542 (10th Cir.1994). *State v. Stevens*, 2016-Ohio-5017, ¶ 36 (4th Dist.) "'Knowledge of a person's prior criminal involvement (to say nothing of a mere arrest) is alone insufficient to give rise to the requisite "reasonable suspicion" to justify a shift in investigatory intrusion from the traffic stop to a firearms or drugs investigation.'" *State v. Brown*, 2010-Ohio-1110, ¶ 27 (5th Dist.), quoting *United States v. Sandoval*, 29 F.3d 537, 542 (10th Cir.1994), quoting *Joshua v. Dewitt*, 341 F.3d 430, 446 (6th Cir.2003). "Accordingly, a person's reputation or past record does not, standing alone, provide an officer with a reasonable suspicion to support a *Terry*-type investigative stop or search." *Brown* at ¶ 28, quoting *State v. Green*, 2016-Ohio-4810, ¶ 22 (7th Dist.). Detective Sheets stated that he never saw any suspicious activity from Belton other than he remained in his vehicle in his own

driveway. Detective Sheets left the area after calling Detective Hourihan to watch the area.

{¶ 90} Detective Hourihan arrived and positioned his car in a way so that he could not be detected. He stated that Detective Sheets informed him that he had prior knowledge of Belton's drug history. Tr. 56. Detective Hourihan was a great distance from Belton's home and had to use binoculars. Tr. 48. He could not discern if Belton's window was down or halfway down. Tr. 54. Detective Hourihan testified that he could not really see but he believed that Belton engaged in hand-to-hand exchanges with two individuals. Tr. 49. He admitted to never seeing drugs or money exchange between Belton and the two individuals. He made this determination based on the brief interaction of the two individuals and Belton. In fact, Detective Hourihan stated that he was on the passenger's side with binoculars so he could only see the approach and lean. Tr. 54. Detective Hourihan stated that Belton pulled in front of his house and a vehicle driven by females stopped. Belton had a brief conversation with the occupants. Detective Hourihan did not see an exchange of any items. Detective Hourihan confirmed that he did not have video or pictures of what he testified to and again affirmed he parked a distance from Belton's home. Officers decided to make up a fictitious reason to detain Belton. Therefore, a patrol car was summoned to approach Belton on a false loud-noise complaint.

{¶ 91} Once the patrol car was behind Belton's vehicle, Belton exited his car. He did not make furtive movements or try to run. There was no traffic violation. Nor was there a valid investigation of a noise complaint. Detective Sheets testified

that Detective Pollack performed a *Terry* search on Belton while he was outside of his automobile and in front of his home. During the search no weapons were found. After noticing Cobb in the vehicle, Detective Sheets saw a knife on a chain around Cobb's neck. Detective Sheets ordered Cobb out of the auto, searched him, and found a bag of drugs in his waistband. Detective Sheets then walked to Belton and conducted an additional search of Belton's person.

{¶ 92} Considering each instance alone or collectively, there is nothing that would lead to Belton being subjected to an investigatory stop. Remember, the detectives were not aware that Cobb was in Belton's vehicle. A noninvestigatory traffic stop may be justified when an officer witnesses a violation of the traffic code. This stop is justified where the officer has probable cause to believe a traffic offense has occurred or was occurring. *State v. Uyi Okundaye*, 2010-Ohio-6363, ¶ 15 (8th Dist.). This is not the case here. A false stop for loud music cannot be a substitute for a violation of the traffic code.

{¶ 93} An investigative or *Terry* stop may be justified where the officer does not necessarily witness a specific traffic violation, but the officer does have sufficient reason to believe that a criminal act has taken place or is occurring, and the officer seeks to confirm or refute this suspicion of criminal activity. *See State v. Scrivens*, 2010-Ohio-712 (11th Dist.), citing *Terry*, 392 U.S. 1, at 21 (1968).

{¶ 94} From the facts of this case, I would determine that Detective Hourihan did not have sufficient reasons to believe that a criminal act had taken place or was occurring. Detective Hourihan stated that he could not see because he

was at a great distance. He could not tell if the window was halfway or all the way down. He did not attempt to stop the two individuals that he suspected were engaged in a hand-to-hand transaction. He did not radio for another vehicle to do so. The detective's sole observation was an approach and a lean. Detective Hourihan stated that he was looking from the view of the passenger side but did not know that Cobb was in the passenger seat. Detective Hourihan's facts are not determinative of any criminal acts. Additionally, Detective Sheets stated that he did not witness Belton commit any illegal acts.

{¶ 95} For these reasons, I would determine that Belton was not and should not have been subject to an investigatory stop. I therefore would determine that the trial court erred when it denied Belton's motion to suppress.