[Cite as *State v. Andrews*, 2025-Ohio-2147.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

STATE OF OHIO,                          :

    Plaintiff-Appellee,           :

    v.                            :

MARQUIS D. ANDREWS,                     :

    Defendant-Appellant.          :

No. 114249

---

### JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED IN PART, VACATED IN
PART, AND REMANDED
**RELEASED AND JOURNALIZED:** June 18, 2025

---

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-24-688017-A

---

### *Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting
Attorney, and Jordan Mason, Assistant Prosecuting
Attorney, *for appellee.*

Jonathan N. Garver, *for appellant.*

LISA B. FORBES, P.J.:

{¶ 1} Marquis D. Andrews ("Andrews") appeals his convictions for aggravated trafficking in drugs, aggravated possession of drugs, possessing criminal tools, having weapons while under disability ("HWWUD"), and tampering with

evidence.  For the following reasons, we affirm in part, vacate in part, and remand for further proceedings pursuant to this opinion.

## I. Factual Background and Procedural History

{¶ 2}  This case arises from an investigation of suspected drug trafficking that the Cleveland Division of Police's vice unit conducted in the summer of 2023. Throughout the investigation, the Cleveland police surveilled a vacant lot at East 102nd Street and Miles Avenue in the City of Cleveland ("vacant lot" or "lot") where they believed drugs were being sold.  As a result of this investigation, the Cleveland police obtained a search warrant for a black Nissan Altima that officers had frequently observed on the lot.  Cleveland police executed this search warrant on September 7, 2023, and arrested Andrews.  At trial, lead investigator Michael Pollack ("Pollack") testified that, immediately before the search, Andrews walked from the Nissan Altima to a line of trees behind the lot (the "tree line").  When the Cleveland police searched the lot, they found methamphetamine and a firearm on the ground near the tree line.

{¶ 3}  After initial charges against Andrews were dismissed, he was reindicted.  On January 10, 2024, Andrews was charged with Count 1, aggravated trafficking in drugs, a felony of the third degree with a one-year firearm specification, in violation of R.C. 2925.03(A)(2), Count 2, aggravated possession of drugs, a felony of the third degree with a one-year firearm specification, in violation of R.C. 2925.11(A), Count 3, possessing criminal tools, a felony of the fifth degree, in violation of R.C. 2923.24(A), Count 4, HWWUD, a felony of the third degree, in

violation of R.C. 2923.13(A)(3), and Count 5, tampering with evidence, a felony of the third degree, in violation of R.C. 2921.12(A)(1).

{¶ 4} On July 23, 2024, the case proceeded to a bench trial. On July 29, 2024, the court found Andrews guilty on all counts but not guilty on all firearm specifications. On July 31, 2024, the court imposed a prison sentence of nine months for each count, to be served concurrently.

{¶ 5} Andrews appeals, raising the following assignments of error:

I. The evidence was insufficient to support Appellant's convictions.

II. Appellant's convictions were against the manifest weight of the evidence.

III. The trial court committed prejudicial error, denied Appellant due process of law, and violated Appellant's right to confrontation by admitting evidence related to an alleged controlled buy where the state had failed to disclose the identify [sic] of the confidential informant involved in the alleged controlled buy. Sixth and Fourteenth Amendments to the Constitution of the United States and Article I, Sections 10 and 16, of the Constitution of the State of Ohio.

IV. The trial court committed plain error by allowing Det. Santiago to give opinion testimony that an alert by his canine unit on a Nissan Altima, when no narcotics had been found inside the Nissan Altima, meant that the narcotics found in the wooded area behind the tree line had been inside the car an hour earlier.

## II. Trial Testimony

### A. Daniel Hourihan

{¶ 6} Daniel Hourihan ("Hourihan") testified that he was a detective for the Cleveland Division of Police. He testified the vacant lot was a "hot spot" for drug transactions that his unit was "all very familiar with from past experience." Hourihan helped surveil the lot before the search warrant for the Nissan Altima was

issued. Hourihan stated the lot was located near an auto repair shop and the tree line.

{¶ 7} Hourihan could not recall when the Cleveland police began surveilling the lot, but believed it occurred through August 2023. Hourihan observed the lot at least once or twice a week, sometimes for up to two hours at a time. Hourihan did so on foot and from a vehicle, using binoculars. He observed people approaching the Nissan Altima and getting in and out of the vehicle. Hourihan also observed Andrews drive the vehicle and stated Andrews was in or near the vehicle "[t]hrough most of our surveillance."

{¶ 8} Hourihan helped execute the search warrant. Before the warrant was executed, Hourihan sat in the passenger seat of a vehicle that lead investigator Pollack drove. At this time, Pollack was watching a live video feed of the lot transmitted from a camera installed on a nearby telephone pole ("pole camera"). Their car was "a few blocks" from the vacant lot. On Pollack's instructions, law enforcement executed the warrant, driving to the lot and detaining everyone present.

{¶ 9} Hourihan searched the Altima. In the car's center console, he located a digital scale that had a white residue on it. Hourihan also prepared an inventory of the items found in the car. These items included lottery tickets, plastic bags, and plastic "tear offs," which Hourihan described as torn-off corners of plastic bags. Hourihan stated, based on his training and experience in law enforcement, that these items are commonly used to package drugs. Hourihan also inventoried a small

bag containing marijuana, a jar containing marijuana, multiple cell phones, black rubber gloves, and over $1,000 in cash, which were all found in the Nissan Altima. Hournihan explained that drug dealers frequently have multiple cell phones.

{¶ 10} Pollack showed Hourihan a cup that held a black glove containing methamphetamine ("the Cup"), which had been discovered at the tree line. Hourihan observed the glove was the same as the black gloves that were found in the car.

{¶ 11} Despite Andrews's statement during the search that he ran a car-cleaning business, Hourihan testified that he had never seen anyone doing a "clean out" of a vehicle on the lot. Hourihan identified Andrews in the courtroom as the individual he had observed while surveilling the lot.

{¶ 12} On cross-examination, Hourihan stated he could not record his surveillance of the lot because he was observing from too far away, the Nissan Altima was not registered to Andrews, and he was not sure if Andrews was driving the car every time he observed it on the lot. Hourihan admitted that there were other cars on the lot and that homes and businesses were located nearby, although he did not observe people from those homes and businesses entering cars parked on the lot. Hourihan stated that Pollack was the only detective that observed the pole-camera footage before law enforcement executed the search warrant and that Andrews was not near the Nissan Altima when arrested.

## B. David Santiago, Jr.

{¶ 13} David Santiago, Jr. ("Santiago") testified that he was an officer for the Cleveland Division of Police's canine unit. During the execution of the search warrant, Santiago was present with Ranger, a dog trained to locate cocaine, crack cocaine, methamphetamine, ecstasy, and heroin. Santiago stated he was not surveilling the lot prior to the execution of the search warrant and was one of the last law enforcement officers to arrive.

{¶ 14} After arriving at the lot, Santiago directed Ranger to the Nissan Altima and instructed him to search. Per Santiago, Ranger alerted to the presence of narcotics in the Nissan Altima. Santiago then took Ranger to the tree line, where he did not indicate that he detected narcotics. Santiago and Ranger then returned to the Altima. Santiago testified that Ranger "hit in the center console area of the vehicle, trunk area where the gloves were also found," and on a wooden box also found in the trunk, indicating, in each instance, narcotics were present.

{¶ 15} Santiago directed Ranger to other vehicles in the lot; he did not alert to the presence of narcotics around those vehicles. Ranger also did not alert to the presence of narcotics on Andrews's person.

{¶ 16} Santiago stated that a dog might alert to the presence of drugs where none are found, which could indicate drugs had been in an area, were removed, and their odor remained. Although there was garbage in the Nissan Altima, Santiago denied that Ranger had ever alerted by mistake in response to the presence of food.

## C. Brandon Melbar

{¶ 17} Brandon Melbar ("Melbar") testified that he was a detective for the Cleveland Division of Police. Melbar helped surveil the lot beginning in July 2023. Melbar stated the Nissan Altima would be parked in the lot "almost every day. And we would see people go to it for a minute or two or leave on foot, or a car pulls up, exits, and goes to the black Nissan and stays for a minute or two and then leaves." Based on his training and experience in law enforcement, Melbar believed these interactions to be drug transactions. Melbar stated that any time he saw the Nissan Altima on the lot, Andrews was present.

{¶ 18} Melbar helped execute the search warrant. Beforehand, he had been stationed in a vehicle east of the lot along with his partner Colbert Stadden ("Stadden"). On Pollack's instruction, Melbar drove to the lot. Melbar searched the tree line and located a handgun, inside a black case. The firearm was a Springfield Armory Hellcat. He also found the black glove with methamphetamine inside. The glove was located at the tree line, between the firearm and the car. Melbar found it after "moving" "a lot of junk" on the ground. Per Melbar, the glove was sitting in "a black cup with an after-market ashtray holder for vehicles. A cup holder."

{¶ 19} Melbar also helped count cash the police confiscated from Andrews. He counted $1,080. Melbar stated, based on his training and experience in law enforcement, that drug traffickers usually carry large amounts of cash to "make change."

{¶ 20} Melbar identified Andrews in the courtroom as the individual he had observed while surveilling the lot. Melbar stated that he did not observe any "clean outs" occurring on the lot, despite Andrews's claim that he was running a cleaning business there.

{¶ 21} On cross-examination, Melbar admitted that he did not record any of his surveillance of the lot. Melbar stated that he did not know to whom the Nissan Altima was registered and that the car was not under continuous surveillance, although he believed he saw Andrews driving it between 50 and 100 times. Melbar also admitted that he did not test the gun for fingerprints, know the results of any DNA testing on the gun, or know to whom the gun was registered. Melbar was also not aware of any DNA testing on the bag of methamphetamine, the black glove containing it, or the Cup.

### D. Colbert Stadden

{¶ 22} Stadden testified that he was a detective for the Cleveland Division of Police. He helped surveil the lot for several months prior to the execution of the search warrant. Stadden visited the lot undercover around ten times, observing from a vehicle or on foot. Stadden observed Andrews at the lot and stated "[t]ypically, he was sitting inside of the Nissan Altima and just engaging with people that would arrive and speak with him." These individuals would have "short interactions" with Andrews, after "walk[ing] up or pull[ing] up in a vehicle . . . ." Based on his training and experience in law enforcement, Stadden believed these interactions to be hand-to-hand drug transactions.

{¶ 23} Prior to the execution of the search warrant, Stadden was "staged out of sight of the parking lot on 102nd and Miles, a couple of streets east." Stadden sat in an unmarked car that Melbar was driving. After Pollack contacted them by radio, Melbar and Stadden drove to the lot.

{¶ 24} Stadden helped search the Nissan Altima and found black latex gloves in the trunk of the car. Based on his training and experience in law enforcement, Stadden stated that drug traffickers commonly use gloves like these to package or handle drugs.

### E. Matthew Pollack

{¶ 25} Pollack testified that he was a detective for the Cleveland Division of Police and that he led the investigation of the lot, which began at the end of July 2023. Pollack stated he observed the Nissan Altima on the vacant lot "almost daily" and saw "hand-to-hands," or "suspected drug transactions," happening in the vehicle. He saw Andrews drive or operate the Nissan Altima "[m]aybe 20, 30 times." Pollack also observed a black Lincoln Navigator, driven by Floyd Harris ("Harris"), visiting the lot "daily," for time increments of 15 minutes to an hour. Pollack recalled that Harris conversed, smoked, and "engag[ed] in suspected drug transactions" with Andrews "as we watched the lot . . . ."

{¶ 26} Pollack averred that the pole camera was installed because the vacant lot was in an open area that was hard to surveil without being detected. Pollack testified that while surveilling the lot, he did not know whether the camera was recording. This was because the camera had been provided by a third party and

Pollack had not used one like it before. Pollack did not think it was necessary for the camera to record what was occurring on the lot because its purpose was to help him see the lot from a distance. The camera transmitted video to his phone.

{¶ 27} Eventually, Pollack obtained a search warrant for the Nissan Altima, which he helped execute. Pollack watched Andrews get "in and out" of the vehicle that day, "doing suspected drug deals . . . ." Prior to executing the warrant, Pollack observed Andrews open his trunk and walk to the tree line. He stopped at the edge of the tree line for a few seconds, before proceeding further, out of Pollack's view. He returned less than 30 seconds later. Pollack did not observe whether Andrews had anything in his hands or his pockets while walking to and from the tree line because of how far away from Andrews the camera was located.

{¶ 28} Pollack testified that, while watching the footage of Andrews, he was sitting in an unmarked car that was three blocks from the lot. As Andrews returned from the tree line, Harris arrived at the lot. Pollack then instructed his unit to execute the search warrant, driving to the lot in less than 20 seconds. Pollack observed Andrews trying to distance himself from the lot while recording law enforcement on his cell phone. Andrews was detained and forfeited a set of keys that unlocked the Nissan Altima.

{¶ 29} Pollack stated that the firearm was discovered five or ten minutes after everyone on the lot was detained. Based on his training and experience in law enforcement, he testified that drug traffickers frequently carry firearms. The firearm — a Springfield Armory Hellcat — was in a black bag that said "Springfield

Armory" on it.  This bag was similar to a bag found in the trunk of the Nissan Altima.  According to Pollack, law enforcement discovered 3,000 grams of psilocybin, a Schedule I hallucinogenic, in Harris's Lincoln Navigator.  Pollack helped search the Nissan Altima, locating the digital scale, marijuana, lottery tickets, sandwich bags, cell phones, and black gloves.

{¶ 30} Pollack stated that Melbar discovered the glove containing methamphetamine inside the Cup.  Pollack tested whether the Cup fit inside the Nissan Altima's cup holder, which it did.  He did not test the Cup in any of the other cars' cup holders.

{¶ 31} Pollack testified the digital scale was submitted to the Cuyahoga County Regional Forensic Science Laboratory ("forensic lab").  The forensic lab tested the residue and identified it as cocaine.  The forensic lab also identified the glove's contents as 14.92 grams of methamphetamine.  Per Pollack, this was a "bulk amount" or a "dealer amount," greater than the amount that an individual user — who would ordinarily consume just one to two grams of methamphetamine per day — would likely carry.

{¶ 32} Pollack stated the firearm was test fired and functioned normally.  Andrews had over $1,000 cash on his person when arrested, $43 of which was later identified as money the Cleveland police had used in a controlled buy.

{¶ 33} Pollack identified Andrews in the courtroom as the individual he observed while surveilling the lot.

{¶ 34} On cross-examination, Pollack admitted to not swabbing the gun or bag for DNA or drug residue. Pollack also admitted the gun had a serial number but that he did not determine if the gun was registered to anyone. He also did not test the Cup for fingerprints or DNA. Pollack did not know how long the glove containing methamphetamine had been in the tree line. He also conceded that the Nissan Altima was not registered to Andrews, but that it was registered to a woman with the same surname. He agreed that, prior to the search, his car was hidden from view so that Andrews would not know he was being surveilled.

## III. Law and Analysis

### A. Assignments of Error I and II — Sufficiency of the Evidence and Manifest Weight of the Evidence

{¶ 35} In his first assignment of error, Andrews asserts the record contained insufficient evidence to support his convictions. His second assignment of error asserts his conviction was against the manifest weight of the evidence.

{¶ 36} "Although the terms 'sufficiency' and 'weight' of the evidence are 'quantitatively and qualitatively different,' we address these issues together," while applying distinct standards of review, because they are closely related. *See State v. Perry*, 2018-Ohio-487, ¶ 10 (8th Dist.), quoting *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997).

{¶ 37} "A claim of insufficient evidence raises the question whether the evidence is legally sufficient to support the verdict as a matter of law." *State v. Parker*, 2022-Ohio-1237, ¶ 7 (8th Dist.), citing *Thompkins* at 386. The relevant

inquiry in a sufficiency challenge is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime existed beyond a reasonable doubt. *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus.

{¶ 38} When making a sufficiency determination, an appellate court does not review whether the State's evidence is to be believed but whether, if believed, the evidence admitted at trial supports the conviction. *State v. Starks*, 2009-Ohio-3375, ¶ 25 (8th Dist.), citing *Thompkins* at 386. Under a sufficiency challenge, witness credibility is immaterial.

{¶ 39} In contrast to sufficiency, a manifest-weight-of-the-evidence challenge attacks the credibility of the evidence presented and questions whether the State met its burden of persuasion. *State v. Whitsett*, 2014-Ohio-4933, ¶ 26 (8th Dist.). Weight of the evidence "addresses the evidence's effect of inducing belief," i.e., "whose evidence is more persuasive — the state's or the defendant's?" *State v. Wilson*, 2007-Ohio-2202, ¶ 25, citing *Thompkins*, 78 Ohio St.3d at 386-387. When considering an appellant's claim that a conviction is against the manifest weight of the evidence, the appellate court functions as a "thirteenth juror" and may disagree "with the factfinder's resolution of . . . conflicting testimony." *Thompkins* at 387, citing *Tibbs v. Florida*, 457 U.S. 31, 42 (1982). Furthermore, in *State v. Jordan*, 2023-Ohio-3800, ¶ 17, quoting *Thompkins* at 387, the Ohio Supreme Court held that "[s]itting as the 'thirteenth juror,' the court of appeals considers whether the

evidence should be believed and may overturn a verdict if it disagrees with the trier of fact's conclusion."

{¶ 40} In a manifest-weight challenge, the appellate court examines the entire record, weighs the evidence and all reasonable inferences that may be drawn therefrom, considers the witnesses' credibility and determines whether, in resolving conflicts in the evidence, the trier of fact "'clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist. 1983). Reversal on manifest-weight grounds is reserved for the "'exceptional case in which the evidence weighs heavily against the conviction.'" *Id.*, quoting *id.*

### 1. Aggravated Trafficking in Drugs

{¶ 41} The record contained sufficient evidence to support Andrews's conviction for Count 1, aggravated trafficking in drugs, a felony of the third degree. Under R.C. 2925.03(A)(1), no person shall knowingly "sell or offer to sell a controlled substance . . .," including methamphetamine.

{¶ 42} A conviction for drug trafficking does not require drugs to be on the defendant's person at the time of the arrest. "Constructive possession is sufficient for conviction of drug trafficking under R.C. 2925.03." *State v. Dukes*, 2011-Ohio-1568, ¶ 14 (8th Dist.), citing *State v. Williams*, 117 Ohio App.3d 488, 492 (1st Dist. 1996). "Constructive possession requires evidence that an individual exercised, or had the ability to exercise, dominion and control over the object, even though that object may not be within his immediate physical possession." *State v. Spencer*,

2024-Ohio-5809 ¶ 18 (8th Dist.), citing *State v. Tyler*, 2013-Ohio-5242, ¶ 16 (8th Dist.). "Presence, 'coupled with another factor or factors probative of dominion or control over the contraband may establish constructive possession.'" *Spencer* at *id.*, quoting *State v Devaughn*, 2020-Ohio-651, ¶ 33 (1st Dist.).

{¶ 43} Although the methamphetamine was not found on Andrews's person or in the car he was driving, the record contained evidence sufficient for the court to conclude that the drugs were within his dominion and control. The Nissan Altima was not registered in Andrews's name, but Hournihan, Stadden, Melbar, and Pollack had all seen Andrews drive the car throughout their investigation. Pollack saw Andrews "in and out" of the vehicle beginning in the morning of September 7, 2023, until his arrest just after 5:00 p.m. Pollack testified that, immediately prior to the search, Andrews exited the Nissan Altima, opened its trunk, and walked to the tree line, where the methamphetamine was eventually found.

{¶ 44} The drug dog Ranger's conduct and the containers in which the methamphetamine was found further support our finding that Andrews constructively possessed the drugs. Methamphetamine is one of the narcotics Ranger is trained to detect. Santiago testified that Ranger alerted to the presence of drugs in the center console and trunk of the Nissan Altima. Santiago stated this could indicate drugs were recently removed from the car, but left an odor that Ranger could still smell. In addition, the methamphetamine was found in a Cup that, per Pollack, fit the Nissan Altima's center console — where Ranger alerted. The methamphetamine was itself inside a black glove that Hournihan testified was the

same as the gloves in the Nissan Altima's trunk, which Andrews had opened immediately before walking to the tree line.

{¶ 45} There is also sufficient evidence to support Andrews's conviction for trafficking the methamphetamine that the Cleveland police discovered. On the day of Andrews's arrest, and throughout their investigation, Pollack and other detectives observed Andrews routinely holding short meetings with others in the Nissan Altima. The State's witnesses believed, based on their police training and experience, that this indicated Andrews was conducting hand-to-hand drug transactions. Pollack also testified that 14.92 grams of methamphetamine exceeds the bulk amount and indicated use in trafficking, rather than individual use.

{¶ 46} The Cleveland police also testified that, based on their training and experience, many of the items found in the Nissan Altima are commonly associated with the drug trade. Hournihan testified that lottery tickets, plastic bags, and plastic "tear offs," are commonly used to package drugs. These items were all found in the Nissan Altima. Melbar further stated that drug dealers commonly carry large amounts of cash, and Hournihan stated that drug dealers frequently carry multiple cell phones. The Cleveland police found over $1,000 cash and multiple cell phones in the car Andrews was driving.

{¶ 47} Aggravated trafficking in drugs is a third-degree felony under R.C. 2925.03(C)(1)(c) where the drug involved is included in Schedule I or Schedule II, with certain exceptions, and if the amount involved is between the bulk amount and five times the bulk amount. Methamphetamine is a Schedule II drug, and the

14.92 grams discovered on the lot exceeds the bulk amount by less than five times. There was sufficient record evidence to support Andrews's conviction for third-degree aggravated drug trafficking.

{¶ 48} The manifest weight of the evidence also supports this conviction. Andrews did not testify or otherwise submit evidence for the court to weigh against the State's. Therefore, our manifest-weight analysis turns on the testifying officers' credibility. Ohio courts consistently hold that the factfinder is "in the best position to assess the credibility of the witnesses who testified at trial" and is free to believe all, part, or none of each witness's testimony. *State v. Jones*, 2020-Ohio-3367, ¶ 85 (8th Dist.). At trial, the finder of fact is in the "best position to view the witnesses and observe their demeanor, gestures, and voice inflections that are critical observations in determining the credibility of a witness and his or her testimony." *State v. Sheline*, 2019-Ohio-528, ¶ 100 (8th Dist.). Having reviewed the record, we cannot say the factfinder clearly lost its way in determining the officers testified credibly and convicting Andrews for this offense.

### 2. Aggravated Possession of Drugs

{¶ 49} The record also contained sufficient evidence to support Andrews's conviction for Count 2, aggravated possession of drugs. "The nature of a drug-trafficking offense under R.C. 2925.03(A)(2), which requires the offender to knowingly 'prepare for shipment, ship, transport, deliver, prepare for distribution, or distribute a controlled substance necessarily includes, to some degree, possession of drugs.'" *State v. Belton*, 2024-Ohio-2357, ¶ 81 (8th Dist.), quoting *State v. Cobb*,

2024-Ohio-458, ¶ 28 (8th Dist.). We find the above evidence supporting Andrews's conviction for aggravated trafficking in drugs was also sufficient to support his conviction for aggravated possession of drugs.

{¶ 50} The manifest weight of the evidence also supports this conviction. As stated above, Andrews presented no evidence, and the factfinder was free to believe the State's witnesses. We find nothing in the record indicating that, in doing so, the factfinder clearly lost its way in finding Andrews guilty of this offense.

### 3. Possessing Criminal Tools

{¶ 51} The record contained sufficient evidence to support convicting Andrews for possessing criminal tools, a felony of the fifth degree. R.C. 2923.24(A) states, "No person shall possess or have under the person's control any substance, device, instrument or article, with purpose to use it criminally." It is "prima facie evidence of criminal purpose" to possess or control "any substance, device, instrument, or article commonly used for criminal purposes, under circumstances indicating the item is intended for criminal use." R.C. 2923.24(B)(3).

{¶ 52} Andrews had control of the digital scale. The Cleveland police discovered the scale located in the center console of the Nissan Altima that Hournihan, Stadden, Melbar, and Pollack had all seen Andrews drive throughout the investigation and on the day of his arrest. Andrews exited the car immediately before he was arrested.

{¶ 53} The circumstances under which Andrews controlled the scale also indicate intended criminal use. Hournihan, who discovered the scale, testified that,

based on his training and experience, scales are indicative of drug trafficking and are typically used to weigh portions of cocaine, heroin, or fentanyl. Hournihan also observed a "white film" "that appeared to be drug residue" on the scale. The forensic lab identified the residue as cocaine.

{¶ 54} Andrews also had over $1,000 in cash on his person, under circumstances indicating criminal use. Melbar testified that drug dealers frequently carry large amounts of cash to make change. In addition, the Cleveland police had used $43 of the cash Andrews carried in a prior controlled buy.

{¶ 55} Possessing criminal tools is a fifth-degree felony where the device is intended for use in a felony. We find the scale and cash were intended for use in aggravated trafficking in drugs, a third-degree felony, for which there was also sufficient evidence to convict Andrews, as explained above. The record contained sufficient evidence to support Andrews's conviction for fifth-degree felony possessing criminal tools.

{¶ 56} The manifest weight of the evidence also supports this conviction. Again, Andrews presented no evidence of his own, and it was the factfinder's prerogative to find that the State's witnesses testified credibly. We find nothing in the record indicating that, in so doing, the factfinder clearly lost its way in convicting Andrews for this offense.

### 4. Having Weapons While Under Disability

{¶ 57} The record does not contain sufficient evidence to support Andrews's conviction for HWWUD. The State did not prove beyond reasonable doubt that

Andrews had or carried a firearm, as required to support a conviction under R.C. 2923.13(A)(3). "To 'have' a firearm within the meaning of R.C. 2923.13(A), a person must have actual or constructive possession of it." *State v. Gardner*, 2017-Ohio-7241 ¶ 33 (8th Dist.), quoting State *v. Davis*, 2016-Ohio-7964, ¶ 13 (8th Dist.). "Constructive possession requires an individual to knowingly exercise dominion and control over the firearm, even though the object may not be within his or her immediate physical possession." *Id.* at ¶ 34. "However, '[c]onstructive possession cannot be inferred by a person's mere presence in the vicinity of contraband.'" *Id.*, at ¶ 35, quoting *State v. Jansen*, 1999 Ohio App. LEXIS 2060, *8 (8th Dist. May 6, 1999).

{¶ 58} Hournihan testified the lot was "always a hot spot" for drug trafficking. Pollack further testified that "most . . . drug traffickers carry firearms. They go hand and hand with drugs." That said, Andrews was not the only person arrested for a drug-related offense on the lot that day. Harris was arrested simultaneously to Andrews, and the Cleveland police found 3,000 grams of psilocybin in the Lincoln Navigator he drove to the lot.

{¶ 59} We are also not persuaded that the similarity between the Springfield Armory bag in which the gun was found and the black bag in the Nissan Altima is sufficient evidence to prove beyond reasonable doubt that Andrews is guilty of this offense. That the firearm was found in a bag could indicate the bag in the Nissan Altima was unrelated to the gun. This is especially so because the bag in the car contained a different item, a "vehicle code reader," which Pollack admitted.

{¶ 60} Pollack testified that he did not see Andrews carrying anything in his hands or pockets when he walked to the tree line where the Cleveland police found the firearm. In addition, none of the officers who surveilled Andrews at the lot stated they had seen him carrying a firearm at any point in their investigation, which lasted at least a month. Pollack further stated that he did not swab the gun or bag containing it for DNA or drug residue. Pollack also did not determine, using the gun's serial number, if the gun was registered to anyone.

{¶ 61} Unlike the methamphetamine, the record includes no evidence linking the gun to Andrews or the Nissan Altima that he drove, except that the Cleveland police discovered the gun on the ground near where Andrews had, per Pollack, recently walked. In sum, the State has demonstrated Andrews's "mere presence in the vicinity" of the firearm. Per *Gardner,* 2017-Ohio-7241 (8th Dist.), that is not enough to establish constructive possession of a firearm.

{¶ 62} In *Gardner*, this court found insufficient evidence supported a HWWUD conviction where law enforcement found a firearm "'tucked under' [a] fire pit" that was located in "an outdoor common area to which numerous people had access." *Id.* at ¶ 37, 43. When he was arrested, defendant was "'less than three feet away'" from the fire pit, "within arm's reach . . . ." *Id.* at ¶ 42, 59. In the present case, Andrews's proximity to the gun is even less clear. When Andrews was arrested, he was more than three feet from the tree line where the gun was found. Further, the record does not show how close Andrews was during his walk into the tree line to the location at which the Cleveland police later discovered the gun. Again, the

pole camera did not record Andrews's movements, and Andrews was out of Pollack's view for 30 seconds after walking into the tree line. Andrews's mere presence in the vicinity of the gun is not enough to support his HWWUD conviction.

{¶ 63} Because Andrews's conviction for HWWUD was not supported by sufficient evidence, his claim that this conviction was against the manifest weight of the evidence is moot. *See E. Cleveland v. Hall*, 2018-Ohio-2198, ¶ 29 (8th Dist.).

### 5. Tampering with Evidence

{¶ 64} The record also does not support Andrews's conviction for tampering with evidence, which required the State to prove that he concealed evidence "knowing that an official proceeding or investigation is in progress, or is about to be or likely to be instituted" under R.C. 2921.12.

{¶ 65} Similar to the reasons we found above that the record contained insufficient evidence that Andrews had or carried the gun, we also find that there is insufficient evidence to support that he concealed the gun at the tree line, thereby tampering with evidence.

{¶ 66} Further, the record contains no evidence that Andrews knew the Cleveland police were surveilling the vacant lot or going to execute a search warrant when he walked to the tree line where the gun and drugs were found. The record indicates that, before the search, the Cleveland police officers participating in this investigation were out of Andrews's view. Pollack was watching Andrews not with the naked eye, but on a video feed that the pole camera transmitted to his phone. Further, Melbar testified that the vehicle he was in with Stadden was unmarked,

several blocks away, and "out of sight" of the lot. Similarly, Pollack testified that the vehicle he was in with Hourihan was unmarked and several blocks away. On cross-examination, Pollack stated the following regarding the reason for the vehicles' locations:

> Q. [E]verybody was, you know, blocks away, sort of hidden, so nobody in the lot would think that cops were coming, right?
>
> A. That's the idea.
>
> Q. So you were making sure that Mr. Andrews or anybody else in that lot wouldn't know that they were being surveilled that day?
>
> A. Correct.

{¶ 67} There is no evidence in the record to support that Andrews was able to see the vehicles from which the Cleveland police were surveilling him.

{¶ 68} Further, law enforcement's arrival at the lot could not have prompted Andrews to conceal the gun and drugs. Pollack testified that he did not order law enforcement to execute the search until Andrews walked into the tree line and returned. Pollack did testify that agents of the Ohio Investigative Unit arrived at the lot before his unit did. However, the record lacks any information about where these agents were positioned prior to the search. Further, these agents began their search on Pollack's orders, after Andrews had already returned from the tree line.

{¶ 69} The Supreme Court of Ohio has found that concealing illegal drugs, even for the purpose of avoiding detection by law enforcement, is insufficient to support a conviction for tampering with evidence where the defendant is "without knowledge of an impeding or likely investigation." *State v. Barry*, 2015-Ohio-5446,

¶ 29. The defendant in *Barry* hid, in a body cavity, heroin that she and several others were transporting by car. Overturning her conviction for tampering with evidence, the Court noted that, at the time the defendant concealed the drugs, "only her coconspirators were present and could have reported her drug offenses, and nothing in the record shows that she thought it likely that she would be stopped by law enforcement." *Barry* at ¶ 27. Like the defendant in *Barry*, Andrews placed methamphetamine in the tree line only in the vicinity of others involved in his drug transactions, and nothing in the record indicates that Andrews knew a Cleveland police investigation was occurring or likely.

{¶ 70} The Supreme Court of Ohio subsequently limited its holding in *Barry* by imputing constructive knowledge of a likely investigation where the defendant commits a crime "that *is* likely to be reported." (Emphasis in original.) *State v. Martin*, 2017-Ohio-1922, ¶ 118 (affirming conviction for tampering with evidence where defendant burned the clothes he had worn when he shot two people). Unlike in the present case, however, in *Martin*, "the crime was not a possessory offense; it was a homicide. Homicides are highly likely to be discovered and investigated."

{¶ 71} This court relied on *Martin* to affirm a conviction for tampering with evidence by inferring a defendant's knowledge that an investigation was likely to occur where he destroyed, repositioned, or unplugged cameras that captured footage of him breaking into a home. *State v. Todorov*, 2023-Ohio-3976, ¶ 36 (8th Dist.). This court explained, "[I]t is reasonable to believe [the defendant] would know that," because he tampered with the cameras, "someone — a homeowner,

alarm company, or local authorities — would be alerted that there was an intruder in the house and an investigation would ensue." *Todorov* at ¶ 35. The home-security cameras tampered with in *Todorov* were by their very nature likely to trigger an investigation upon being altered or destroyed. We cannot say the same about the methamphetamine Andrews concealed.

{¶ 72} There is no evidence that Andrews concealed evidence "knowing that an official investigation or proceeding [was] in progress," as required to establish tampering with evidence under R.C. 2921.12. The record is insufficient to support Andrews's conviction for tampering with evidence.

{¶ 73} Because Andrews's conviction for tampering with evidence was not supported by sufficient evidence, his manifest-weight claim on this offense is moot. *See Hall*, 2018-Ohio-2198, at ¶ 29 (8th Dist.).

### B. Assignment of Error III — Evidence that Andrews Possessed Cash the Cleveland Police Had Used in a "Controlled Buy"

{¶ 74} Andrews asserts, in his third assignment of error, that the court erred by admitting evidence Andrews possessed cash the Cleveland police had used in a "controlled buy" without ordering the State to disclose the identity of a confidential-reliable informant ("CRI") that supposedly bought from Andrews. We disagree.

{¶ 75} The Ohio Supreme Court has held that "the identity of an informant must be revealed to a criminal defendant when the testimony of the informant is vital to establishing an element of the crime or would be helpful or beneficial to the accused in preparing or making a defense to criminal charges." *State v. Williams*, 4

Ohio St.3d 74, 77 (1983). We review a trial court's decision regarding disclosure of a confidential informant for an abuse of discretion. *State v. Petty*, 2023-Ohio-1146, ¶ 6 (8th Dist.), citing *State v. Garcia*, 1995 Ohio App. LEXIS 3467 (8th Dist. Aug. 24, 1995). An abuse of discretion occurs when a court exercises "its judgment, in an unwarranted way, in regard to a matter over which it has discretionary authority." *Abdullah v. Johnson*, 2021-Ohio-3304, ¶ 35.

{¶ 76} The trial court did not abuse its discretion in admitting testimony that Andrews had "controlled buy" money on his person when arrested, without ordering the State to disclose the CRI's identity. The CRI's identity was not vital to establishing an element of a crime or beneficial to Andrews's defense. Andrews was not charged with selling drugs to the confidential informant. *See Petty* at ¶ 18 (finding a confidential informant's identity was not necessary to establish the crimes at issue because defendant was not charged with selling drugs to the confidential informant).

{¶ 77} For this same reason, *State v. Phillips*, 27 Ohio St.2d 294 (1971), which Andrews cites to support this assignment of error, is easily differentiated from the present case. In *Phillips*, the State attempted to prosecute a defendant for selling drugs to a confidential informant based on the testimony of an officer who had not been present for the sale. In this case, none of the State's witnesses testified that they observed Andrews obtain the "controlled buy" money by supposedly selling drugs to an informant, and he was not charged with doing so. The CRI's identity was not vital to establish an element of the crime or beneficial to Andrews's defense.

The trial court's admission of evidence that Andrews possessed "controlled buy" money was not an abuse of discretion.

{¶ 78} Accordingly, assignment of error No. 3 is overruled.

**C. Assignment of Error IV — Santiago's Testimony That Ranger Alerted to the Presence of Drugs While Searching the Nissan Altima**

{¶ 79} In his fourth assignment of error, Andrews asserts the court committed plain error by admitting Santiago's testimony that Ranger alerted to the presence of drugs in the Nissan Altima. Andrews argues Santiago's testimony should have been excluded because it was speculative and an inadmissible expert opinion. We disagree.

{¶ 80} Andrews did not object to Santiago's testimony at trial, waiving all but plain error. *See Rogers*, 2015-Ohio-2459, at ¶ 3. "To prevail under a plain error analysis, the appellant bears the burden of demonstrating, but for the error, the outcome of the trial would clearly have been different." *Id.*, citing *State v. Payne*, 2007-Ohio-4642, ¶ 17.

{¶ 81} Admitting Santiago's testimony was not a plain error. Andrews's argument mischaracterizes Santiago's statements. Santiago never concluded that the methamphetamine was present in the Nissan Altima. He stated only that Ranger alerted to the presence of narcotics in the vehicle and explained that narcotics may leave behind an odor that causes Ranger to alert where drugs once were present, even if they no longer are.

{¶ 82} Andrews also argues the court could not conclude, from Santiago's testimony, that the methamphetamine had been in the Nissan Altima without violating the rule against the "stacking of inferences." *See Hurt v. Charles J. Rogers Transp. Co.*, 164 Ohio St. 329 (1955), paragraph one of the syllabus ("An inference based solely and entirely upon another inference, unsupported by any additional fact or another inference from other facts, is an inference on an inference and may not be indulged in by a jury."). However, the record included facts other than Santiago's testimony from which the court could have concluded the methamphetamine had previously been in the Nissan Altima. Pollack testified that, immediately before the warrant was executed, Andrews exited the car and walked to the tree line where the drugs were later found. Also, the officers that surveilled the lot all testified that they believed Andrews was conducting hand-to-hand drug transactions in the Nissan Altima, applying their knowledge and training as law enforcement officers to their observations of people entering and exiting the car for short meetings with Andrews. As such, the court did not need to rely solely on Santiago's testimony to conclude the methamphetamine had been in the vehicle.

{¶ 83} We also find Santiago's statements that Ranger alerted to the presence of narcotics in the Nissan Altima were not expert testimony that the trial court plainly erred by admitting. Evid R. 701 states that a lay witness — a witness not recognized as an expert — may testify about "opinions or inferences which are (1) rationally based on the perception of the witness and (2) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue."

{¶ 84} On this topic, the Supreme Court of Ohio has stated:

It is consistent with [the] emerging view of Evid.R. 701 that courts have permitted lay witnesses to express their opinions in areas in which it would ordinarily be expected that an expert must be qualified under Evid.R. 702. . . . Although these cases are of a technical nature in that they allow lay opinion testimony on a subject outside the realm of common knowledge, they still fall within the ambit of the rule's requirement that a lay witness's opinion be rationally based on firsthand observations and helpful in determining a fact in issue. These cases are not based on specialized knowledge within the scope of Evid.R. 702, but rather are based upon a layperson's personal knowledge and experience.

*State v. McKee*, 91 Ohio St.3d 292, 296-297 (2001).

{¶ 85} In accordance with *McKee*, any opinion contained in Santiago's testimony was rationally based on firsthand observations and helpful in determining a fact in issue, as Evid.R. 701 requires lay opinion testimony to be. Santiago was present at the lot and instructed Ranger to search the Nissan Altima and tree line for narcotics. Santiago observed the dog's reactions during this search. Based on his training and experience in the Cleveland police's canine unit, Santiago determined that Ranger's behavior — including sitting — indicated he smelled narcotics in the car. Thus, Santiago concluded drugs had been present in the car based on his firsthand observation of facts, rather than on facts outside his perception, as would an expert witness.

{¶ 86} To the extent Andrews contests either the reliability of Ranger's alerts or Santiago's ability to interpret Ranger's behavior, Andrews's trial counsel extensively cross-examined Santiago on both topics. In light of the other evidence,

Andrews has not demonstrated that excluding Santiago's testimony would have changed the outcome of this trial, such that admitting it was a plain error.

**{¶ 87}** Accordingly, assignment of error No. 4 is overruled.

**{¶ 88}** Judgment affirmed in part and vacated in part. Andrews's convictions for HWWUD and tampering with evidence are hereby vacated. Andrews's remaining convictions are affirmed. Case remanded for proceedings consistent with this opinion.

It is ordered that appellant and appellee share the costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
LISA B. FORBES, PRESIDING JUDGE

EMANUELLA D. GROVES, J., and
MICHAEL JOHN RYAN, J., CONCUR